MASKEL CONSTRUCTION COMPANY, INC. *v.*
TOWN OF GLASTONBURY

KING, C. J., ALCORN, HOUSE, THIM and RYAN, Js.

Argued November 12—decided December 22, 1969

*Edward C. Wynne,* for the appellant (defendant).

*Walter R. Dudek,* for the appellee (plaintiff).

House, J. This action was brought by the plaintiff against the town of Glastonbury for compensation for services and materials claimed to be due under the provisions of a sewer construction contract. The contract, known as a unit price contract, was one in which a bidder did not submit a bid on the project at a total price but rather submitted a bid for each unit item to be installed, the total cost being subsequently determined by the number of such units

ordered by the defendant's sewer authority and installed by the contractor. The defendant supplied the bidders with maps or plans and specifications of the proposed sanitary sewer system and invited bids for a unit price contract. The plaintiff was the successful bidder and was awarded the contract.

Two provisions of the contract are of special significance in this case. One related to a term known in sewer construction as "conflict." A "conflict" is defined as a situation where the designed sewer comes into conflict or is obstructed by what is actually found to exist in the ground and which was not shown on the plan or map. The contract anticipated the discovery of conflicts in the course of the work, and the defendant expressly disclaimed the completeness and accuracy of the underground structures indicated in the drawings on the basis of which bids were solicited.[1] Another section of the contract provided that the work should be constructed under the supervision of an engineering firm to whom all questions arising as to performance of the contract should be referred for decision and whose judgment exercised in reasonable discretion should be final and

[1] Paragraph Z of division 3 of the contract entitled "General Conditions" reads as follows:

"All obtainable information on underground structures affecting this work has been shown on the drawings. This information is neither complete nor accurate and can be considered only as a guide. The contractor shall consult with all town officials and all utility companies concerned and shall cooperate with the Town and company officials in maintaining all existing services. When approved by the Engineers, test pits may be dug ahead of the trench to locate existing structures. In any event, it shall be the contractor's responsibility to maintain, move, relocate, repair and/or replace all structures affected by his work in accordance with the direction of the Engineers or the official responsible for the service, and to pay all fees, inspection charges and costs assessed against the work in order to maintain all services, and the contractor shall include compensation for this work in his bid price for excavation and backfilling trench."

accepted by the contractor and the town in all cases.[2]

When the construction was completed the plaintiff made claims for additional compensation, asserting that extra work was required because the plans, maps and specifications provided by the defendant, which were part of the contract, described physical conditions which differed from those encountered in the field when construction commenced. Pursuant to the provisions of the contract, the supervising engineer made decisions on all of the claims made by the plaintiff. Some of these claims were paid by the town in accordance with such decisions and are not involved in this action. Six claims decided adversely to the contentions of the plaintiff and one claim decided in favor of the plaintiff but only partially paid by the defendant were pressed by the plaintiff in this action. The court found for the plaintiff on all seven claims and rendered judgment for $12,066.16 damages. It is from this judgment that the defendant has appealed.

Five of the plaintiff's seven claims pressed in this case arose from the existence of conflicts. The court concluded that where a conflict is unexpectedly discovered it is the custom of the trade in sewer con-

---

[2] "The work shall be constructed under the supervision of an engineering firm who will be designated by the Town. This firm is hereinafter called the Engineers and is so-called in the documents made a part of this Contract. They shall interpret the Drawings and Specifications. All questions arising as to the performance of this Contract shall be referred to them for decision. They shall have authority to stop the work whenever necessary to insure the proper execution of this Contract.

"In all cases in which this Contract provides for estimates, opinions, or other judgments by the Engineers, and in any other instance arising under, or on account of, this Contract in which such judgment of the Engineers shall be necessary, proper, or incidental, the said judgment exercised in reasonable discretion shall be final and shall be accepted by the Contractor and Town in all cases."

struction for the owner or municipality to be charged with the extra cost of solving the conflict problem, that as a matter of interpretation the contract contemplated that the defendant town should pay any extra cost arising from the existence of a conflict and that the engineer was arbitrary and unreasonable in his decisions on these claims of the plaintiff. We find no factual basis whatsoever in the court's finding to support its conclusion as to any custom in the trade. Even if the existence of such a custom in the sewer construction trade had been proved, it nevertheless could not vary the specific terms of the contract, which, as we have noted (footnote 1), expressly stated that the possible conflicts indicated on the drawings were neither accurate nor complete and that it should be the responsibility of the contractor to move and relocate any conflicts in accordance with the direction of the engineers or the official responsible for the service. "After this, to permit oral testimony, or prior or contemporaneous conversation, or circumstances, or usages &c., in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." *Glendale Woolen Co. v. Protection Ins. Co.,* 21 Conn. 19, 37.

Not only did the defendant expressly disclaim any warranty as to the existence or nonexistence of any conflicting underground structures, but it affirmatively represented that the information indicated in the drawings, while containing all obtainable information, was "neither complete nor accurate." "The defendant was entitled to limit its commitment to bidders, and it clearly brought home to them that it was making no representation as to the . . . conditions which might be found in the actual performance of the work." *Construction Aggregates Corpo-*

*ration* v. *State,* 148 Conn. 315, 325, 170 A.2d 274. In the face of this warning and disclaimer the plaintiff in submitting its bid took its chances on the number and extent of conflicts which might be discovered in the course of the work.

Finally, and conclusively so far as this aspect of the appeal is concerned, the record discloses that the engineer in accordance with the terms of the contract considered each of the plaintiff's claims based on the conflicts discovered and in writing rendered his decisions. We find no basis for the court's conclusion that his decisions were arbitrary and unreasonable nor any justification for the substitution by the court of its own judgment for that of the engineer, whose opinions and judgments, exercised in reasonable discretion, the parties agreed "shall be accepted by the Contractor and Town in all cases." Here the parties to the contract made a third party, the engineer, the final judge to decide, acting in good faith and in the exercise of his best judgment, when one of the contracting parties had fulfilled the requirements of the contract. "If, in the honest performance of this duty, the engineer has in good faith and in the exercise of his best judgment decided that the . . . [plaintiff was] required to perform the work and furnish the materials in question, in the proper performance of . . . [its] written contract, . . . [it] cannot recover in this suit. Such a decision so rendered by the engineer, that they were a part of the written contract, would be a conclusive decision that they were not extras." *Beattie* v. *McMullen,* 82 Conn. 484, 491, 74 A. 767; see also *Friend* v. *Green,* 146 Conn. 360, 364, 151 A.2d 343; *Dahl* v. *Edwin Moss & Son, Inc.,* 136 Conn. 147, 154, 69 A.2d 562; *George S. Chatfield Co.* v. *O'Neill,* 89 Conn. 172, 174, 93 A. 133.

We conclude that the court was in error in reversing the decision reached by the engineer with respect to the several conflicts items of the plaintiff's claim and that damages should not have been awarded contrary to his decision. It does appear that the defendant has only paid $1928.79 on one of the conflicts claims where the engineer had recommended additional compensation to the plaintiff in the amount of $2121.67. Accordingly, as to this one conflict item judgment for the plaintiff was correct but only to the extent of $192.88.

Another claim pressed by the plaintiff is for backfill material supplied during winter sewer construction on Hebron Avenue. The contract specifications provided how backfilling operations should be carried out and that the plaintiff should be entitled to the full cost of furnishing and placing sand, including that required in rock trenches, "but only when insufficient acceptable backfilling is found on the job." They also provided with respect to backfill material: "If any section of trench does not supply enough of such material it shall be brought from another part of the work. If sufficient satisfactory material is not found on the work sand shall be provided and used for the filling." The plaintiff claimed that, although excess material for backfill was available at other locations within the contract limits, the specifications did not require the contractor to haul such material from one job site to another. It therefore brought in borrow rather than haul suitable material from other job sites and for this claimed extra compensation in the amount of $5788. The engineer, acting under the authority vested in him by the contract, rejected the plaintiff's claim, found that "[e]xcess suitable material from other portions of the job, within the limits of con-

tract 1 was available at the time" and concluded: "Based upon our interpretation of the provisions set forth under Division 14 of the specifications, the contractor is obligated to utilize all suitable fill on the job site regardless of location. Therefore we are unable to find justification for payment of this claim." Again, on this claim we find no justification for the action of the court in substituting its decision for that of the engineer.

The remaining claim is of a different nature. After the contract was awarded, the state highway department obtained ownership of a portion of a highway in which a sewer was to be laid. The specifications for the contract permitted alternate backfill in all trenches in paved areas with gravel, processed gravel or processed traprock. The plaintiff was using bank run gravel throughout the job, but the state, through its inspector, stipulated that only processed stone be used as a pavement base in the state highway. The use of processed stone therefore became necessary in that portion of the job. The engineer disallowed the plaintiff's claim for $580.53 compensation for the difference in the cost of processed stone over the cost of gravel, stating: "Although the State restricted the contractor to one of the specification alternates, it is our opinion that additional payment cannot be justified for the use of a material originally contained in the specifications. This is not a case of material substitution but rather preference of a specification alternate."

As to this claim we conclude that the court properly held that the plaintiff should recover the extra cost incurred in resurfacing the highway in accordance with the state's requirements rather than in accord with the plaintiff's optional choice of the less expensive of the three alternates permitted by the

specifications. This was a situation which developed after the contract was executed and was not contemplated by either party. It was a situation not within the purview of what the contract provided the engineer was empowered to decide. The court properly determined that the plaintiff was entitled to recover on this claim for added cost in resurfacing the highway in the amount of $580.53.

There is error in the amount of the judgment only, the judgment is set aside and the case is remanded with direction to render judgment for the plaintiff to recover $773.41.

In this opinion the other judges concurred.