## TIMOTHY E. DILLS ET AL. *v.* TOWN OF ENFIELD ET AL.
### (13533)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and COVELLO, Js.

Argued February 8—decision released April 18, 1989

*Hubert J. Santos,* for the appellant (plaintiff Neecon Corporation).

*Philip S. Walker,* with whom were *Joseph L. Hammer* and *Nora R. Dannehy,* for the appellees (defendants).

PETERS, C. J. The principal issue in this appeal is whether the doctrine of commercial impracticability excuses a developer from submitting construction plans when he discovers that necessary financing has become unavailable. The plaintiffs, Timothy E. Dills and the Neecon Corporation, sued the defendants, the town of Enfield (town) and the Enfield development agency (agency), to recover a $100,000 deposit Dills had paid the agency under an option and contract for sale. The trial court referred the case to Attorney J. Read Murphy, a state trial referee appointed pursuant to General Statutes § 52-434 (a) (4). Following a hearing and the parties' submission of briefs, the referee reported his findings of fact and recommended that judgment enter for the plaintiffs. The trial court rejected the referee's recommendation, instead rendering judgment for the defendants. The plaintiff Neecon Corporation appealed to the Appellate Court and we transferred the case here pursuant to Practice Book § 4023. We find no error.

The relevant facts reported by the referee, accepted by the trial court and supported by the record are as

follows. The town of Enfield instructed its development agency to solicit private developers for the Enfield Memorial Industrial Park to be constructed on town property. Pursuant to an earlier option agreement, on May 1, 1974, the plaintiff Dills and the development agency entered into a contract for the sale of the land to be developed. Dills at that time paid a $100,000 deposit toward the contract price of $985,900. The plaintiff Neecon Corporation, owned by Dills, was to perform the necessary work, and has become, by virtue of an assignment from Dills, the only remaining plaintiff in this appeal.

Under the terms of the contract, the development agency agreed to convey the property to the developer sixty days after the fulfillment of two conditions: (1) the submission and approval of construction plans in accordance with section 301 of the contract;[1] and (2)

---

[1] Section 301 of the contract of sale provided: "PLANS FOR CONSTRUC-TION. Plans and specifications with respect to the Development of the Property and construction thereon shall be in conformity with the Development Plan, the Agreement, and all applicable State and local laws and regulations. As promptly as possible after the date of the Agreement, and, in any event, no later than the time specified therefor in Paragraph (a), Section 4 of Part I hereof, the Developer shall submit to the Agency, for approval by the Agency, plans, drawings, specifications, and related documents, and the proposed construction schedule (which plans, drawings, specifications, related documents, and progress schedule, together with any and all changes therein that may hereafter be made and submitted to the Agency as herein provided, are, except as otherwise clearly indicated by the context, hereinafter called 'Construction Plans') with respect to the Development to be constructed by the Developer on the Property, in sufficient completeness and detail to show that such improvements and construction thereof will be in accordance with the Development Plan and the Agreement. The Agency shall, if the Construction Plans originally submitted conform to the provisions of the Development Plan and the Agreement, approve in writting such Construction Plans and no further filing by the Developer or approval by the Agency thereof shall be required except with respect to any material change. Such construction plans shall, in any event, be deemed approved unless rejection thereof in writing by the Agency, in whole or in part, setting forth in detail the reasons therefor, shall be made within THIRTY (30) days after the date of their receipt by the Agency. If the Agency so rejects the Construction Plans in whole or in part as not being in con-

the submission of evidence of financial capacity in accordance with section 304 of the contract.[2] The contract also included provisions for its termination by either party. Section 702 (b) of the contract allowed the developer to withdraw and to reclaim his deposit if, after the preparation of construction plans satisfactory to the agency, the developer could not obtain the necessary mortgage financing.[3] Section 703 (b) of the contract allowed the agency to terminate the contract, retaining the deposit as liquidated damages, if the developer failed to submit acceptable construction plans.[4]

---

formity with the Development Plan or the Agreement, the Developer shall submit new or corrected Construction Plans which are in conformity with the Development Plan and the Agreement, within the time specified therefor in Paragraph (b), Section 4 of Part I hereof, after written notification to the Developer of the rejection. The provisions of this Section relating to approval, rejection, and submission of corrected Construction Plans herein above provided with respect to the original Construction Plans shall continue to apply until the Construction Plans have been approved by the Agency: PROVIDED, that in any event the Developer shall submit Construction Plans which are in conformity with the requirements of the Development Plan and the Agreement, as determined by the Agency, no later than the time specified therefor in Paragraph (c), Section 4 of Part I hereof. All work with respect to the Development to be constructed or provided by the Developer on the Property shall be in conformity with the Construction Plans as approved by the Agency."

[2] Section 304 of the contract of sale provided: "The submission of Construction Plans and their approval by the Agency as provided in Section 301 hereof, and the submission of evidence of equity capital and commitments for mortgage financing as provided in Section 303 hereof are conditions precedent to the obligation of the Agency to convey the Property to the Developer."

[3] Section 702 of the contract of sale provided in relevant part: "In the event that . . . (b) the Developer shall, after preparation of Construction Plans satisfactory to the Agency, furnish evidence satisfactory to the Agency that it has been unable, after and despite diligent effort for a period of sixty (60) days after approval by the Agency of the Construction Plans, to obtain mortgage financing for the construction of the Development . . . then the Agreement shall, at the option of the Developer, be terminated by written notice thereof to the Agency, and any deposit paid by the Developer be returned to it . . . ."

[4] Section 703 of the contract of sale provided in relevant part: "In the event that . . . (b) the Developer does not submit Construction Plans as

Dills never submitted construction plans that were acceptable to the agency. A set of plans denominated "preliminary" was rejected by the agency on June 24, 1974. The agency accepted a revised set of "preliminary plans" and drawings three months later, but demanded the submission of full construction plans and specifications by early December. The referee found that the preliminary sets of plans did not themselves meet the definition of "construction plans" in section 301.[5] The referee agreed with the agency's interpretation of section 301 of the contract as requiring the developer to submit full construction plans within 210 days of the agency's approval of preliminary plans.

The reason Dills failed to submit construction plans was that, despite diligent efforts, he was unable to obtain mortgage financing. Thereafter, both parties attempted, with proper notification, to invoke the contract's termination clauses. On December 19, 1974, the agency, having been informed by Dills of his financial difficulties, voted to terminate the agreement pursuant to section 703 (b) of the contract of sale and to retain the $100,000 deposit as liquidated damages.[6] On

required by the Agreement . . . then the Agreement, and any rights of the Developer . . . shall, at the option of the Agency, be terminated by the Agency, by written notice thereof to the Developer, in which event, the deposit shall be retained by the Agency as liquidated damages . . . . "

Section 303 of the contract of sale provided that "[a]s promptly as possible *after approval by the Agency of the Construction Plans* . . . the Developer shall submit to the Agency evidence satisfactory to the Agency that the Developer has the equity capital and commitments for mortgage financing necessary for construction of the Development." (Emphasis added.)

[5] Although the contract makes no mention of "preliminary plans," the plaintiff claims that the agency required such plans to gain zoning approval, which Dills received. The defendants have not disputed this representation and the referee stated that that section contemplated such "preliminary plans."

[6] By letter dated December 26, 1974, the agency gave Dills notice of this action.

December 22, 1974, Dills' attorney notified the agency that, because of Dills' inability to obtain financing within the time specified in the contract,[7] Dills was terminating the agreement pursuant to section 702 (b) of the contract of sale.

In the referee's view, although Dills had never submitted anything more than "preliminary plans," the fact that he could not obtain financing had become evident and "[t]he costly rendition of detailed drawings and specifications which were part of the Construction Plans thus became a useless act." He concluded, therefore, that "[t]he duty of [Dills] to provide full Construction Plans by December, 1974 was discharged by supervening impracticability." Accordingly, he recommended that the plaintiffs recover their $100,000 deposit.

After unsuccessful efforts to persuade the referee to make material changes in his report, the defendants moved the trial court, pursuant to Practice Book § 440, to reject the report and refer the case to another referee for a new trial, or to revoke the reference and leave the case to be disposed of in court. Alternatively, the defendants took exception in the trial court to the referee's report and findings of fact and moved the court, pursuant to Practice Book § 439, to grant the corrections they had proposed in their motion to correct and to strike the corrections granted at the plaintiff's request.

On July 14, 1988, the trial court issued its decision rejecting the referee's recommendation that judgment enter for the plaintiffs. The court accepted the referee's findings that the plans submitted by Dills were preliminary plans but not construction plans as defined by

---

[7] Section 702 (b) of the contract allowed the developer sixty days to obtain mortgage financing unless the agency requested that he extend his efforts for another sixty days. The agency had made no such request.

the contract. It also accepted the finding that Dills had unsuccessfully engaged in "diligent efforts" to secure financing. Reviewing the history of the contract negotiations between the parties, the court held that the defendants were entitled to judgment. The court noted that the town had been concerned about the developer's reliability because an earlier option agreement between Dills and the town, concerning this same property, had failed to come to fruition. In response, Dills had publicly assured the town "that he was going to be putting $250,000 on the line," the contemplated cost of preparing the construction plans. Because the various contract provisions, including the furnishing of construction plans, had been bargained for, the court concluded that Dills could not invoke the doctrine of impracticability in this case. Absent a showing of the impracticability of preparing and submitting construction plans, the court held that "the facts found by the attorney-referee can only lead to one conclusion," i.e., judgment for the defendants.

After the trial court denied the plaintiffs' motion for reconsideration,[8] the plaintiff Neecon took the present appeal. It claims that the trial court erred in (1) rendering judgment for the defendants, rather than either rendering judgment for the plaintiffs or revoking the reference to the attorney state trial referee and remanding the case for further findings by an appropriate factfinder, and (2) finding facts not found by the

---

[8] On July 22, 1988, the plaintiff moved the court to set aside, reopen, reconsider or modify the judgment rendered, claiming that the court had no authority to render judgment for the defendants and that it had found certain facts not found by the referee or rejected by him. The trial court denied the plaintiff's motion, asserting that it did have the authority to render judgment for the defendants, that it had "accepted the findings and applied the law it thought was correct to those findings" and that "based on [the referee's] findings," the court was permitted to render judgment for the defendant.

attorney state trial referee. We conclude that the trial court did not err either procedurally or substantively.

I

In its procedural attack on the trial court's judgment, the plaintiff proceeds from the premise that reference of a case to an attorney trial referee necessarily limits the subsequent authority of the trial court to address issues of law. According to the plaintiff, the issuance of a referee's report deprives the court of authority to render any judgment except that recommended by the referee. The plaintiff maintains that, if the court, disagreeing with the referee, decides to reject the report, the court must refer the case for a new trial either before a new referee or before another trial judge. We disagree.

This court discussed the relationship between attorney trial referees and trial court judges in *Seal Audio, Inc.* v. *Bozak, Inc.,* 199 Conn. 496, 508 A.2d 415 (1986), in which we upheld the constitutionality of General Statutes § 52-434 (a) (4), the statute authorizing the chief justice to appoint such referees.[9] We concluded that, although attorney trial referees could act as factfinders, in the same manner as committees appointed pursuant to General Statutes § 52-425; id., 504–505; they lacked the power to render judgments. Id., 502. The reports of referees are therefore "reviewable in accordance with well established procedures prior to the rendition of judgment by the court. Practice Book §§ 428 through 445." Id.; see also *Bowman* v. *1477 Central Avenue Apartments, Inc.,* 203 Conn. 246, 250, 524 A.2d 610 (1987); *Logan* v. *Lenhart,* 158 Conn. 611, 612, 259 A.2d 643 (1969). As provided in Practice Book

---

[9] General Statutes § 52-434 (a) (4) provides in relevant part: "[T]he chief justice may appoint, from qualified members of the bar of the state, who are electors and residents of this state, as many state referees as he may from time to time deem advisable or necessary."

§ 434, a referee's determinations of law in his or her report are not binding on the court. *Seal Audio, Inc.* v. *Bozak, Inc.,* supra, 509–10.

Our holding in *Seal Audio, Inc.,* necessarily implies that the trial court has the power to render whatever judgment appropriately follows, as a matter of law, from the facts found by the attorney trial referee. The nondelegable judicial duty to render judgments is not limited to endorsement of the decision recommended by the referee. The trial court's unlimited authority in this regard is underscored by the first sentence of Practice Book § 443, which provides, without qualification: "The court shall render *such judgment as the law* requires upon the facts in the report as it may be corrected." (Emphasis added.) Although the remainder of Practice Book § 443 contemplates the possibility of further proceedings before a referee or a court, we construe that direction to apply only when a trial court discovers material errors in the referee's factual findings.[10] See *Rostenberg-Doern Co.* v. *Weiner,* 17 Conn. App. 294, 300, 552 A.2d 827 (1989).

We therefore conclude that the trial court had the inherent authority, even without a request for judgment by the defendants, to render whatever judgment was appropriate in light of the facts found by the attorney trial referee. There was no procedural impediment to the trial court's exercise of this jurisdiction.

## II

Even though the trial court had jurisdiction to render an appropriate judgment, the outstanding unre-

---

[10] Practice Book § 443 provides: "The court shall render such judgment as the law requires upon the facts in the report as it may be corrected. If the court finds that the committee has materially erred in his rulings or that by reason of material corrections in his findings the basis of the report is subverted or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer the matter to the same or another committee for a new trial or revoke the reference and leave the case to be disposed of in court."

voked reference of the litigation to the attorney trial referee deprived the trial court of the authority to retry the case. The court could not find additional facts or reject others "unless a material fact has been found without evidence or the [referee] has failed to find an admitted or undisputed fact, or has found a fact in such doubtful language that its real meaning does not appear." Practice Book § 439; see *Bowman* v. *1477 Central Avenue Apartments, Inc.,* supra, 256–57; *Cohn* v. *Hartford,* 130 Conn. 699, 704–705, 37 A.2d 237 (1944). Thus, our review of the substantive merits of the trial court's judgment devolves into two questions: (1) did the court exceed its authority by finding additional facts or rejecting facts found by the referee; and (2) did the court err in applying the law to the facts found?

A

The plaintiff claims that the trial court improperly exercised the role of factfinder by concluding that: (1) the parties had "bargained for" the two contract provisions at issue herein (the provisions for submission of construction plans and for financing); and (2) the contract provisions were clear and unambiguous.[11] The trial court expressly disavowed such a role. We hold that the trial court did not exceed its authority.

The plaintiff argues that the trial court improperly found facts about the bargaining process that led to the contract in this case. The trial court did recount the history of the transaction, and noted the defend-

---

[11] In oral argument before this court the plaintiff also contended that the trial court exceeded its authority when it stated that certain town officials had expressed concern that Dills would not come through with the plans and when it stated that Dills had determined that financing was unavailable because the climate for this kind of project had changed. Our review of the record and the transcript of the plaintiff's postjudgment motion reveals that it did not bring these claims to the attention of the trial court, and therefore we do not review them. Practice Book § 4185.

ants' allegation that Dills had indicated his readiness to invest $250,000 in procuring construction plans. The referee made no finding that the contract between the parties had resulted from the defendants' reliance on this representation.[12] Nonetheless, we fail to perceive how the plaintiff was injured by the trial court's comments. The referee never found that the parties had *not* bargained for the contractual provisions here at issue. What motivated the defendants to enter into the contract is unimportant in this case. What is important is that the parties intended that Dills assume full financial responsibility until such time as he submitted construction plans acceptable to the defendants, and the referee so found.[13]

The plaintiff also contends that the trial court's statement that the "contract provisions are clear and unambiguous" in effect rejects the referee's finding that they were indeed ambiguous. The plaintiff contends that the referee's findings that section 301 called for a two-step procedure (preliminary plans followed by full construction plans within 210 days) and that zoning approval led the developer to the next two steps (arranging financing and preparing detailed drawings and specifications sufficient to build the building) amounted to a finding of ambiguity. We disagree.

Examination of the reason given in the referee's report for discharging the plaintiffs of their contractual obligation demonstrates that the trial court read

---

[12] In his Rulings on Motions to Reconsider Rulings on Evidence, the referee stated: "I do not find that the Agency entered into the Agreement on the basis of a representation of $250,000 of costs to prepare Construction Plans. Plaintiff's costs may not have risen to this amount, but he certainly incurred costs (some $73,000) and put the deposit at risk."

[13] The referee stated in his memorandum: "Section 303, Part II, requires the Developer to submit to the Agency 'as promptly as possible after approval by the Agency of the Construction Plans . . .' evidence that it had mortgage financing necessary for construction."

the report correctly. The referee made no express finding that there was any ambiguity in the provisions in sections 303 or 702 (b) of the contract,[14] which required the plaintiffs to submit acceptable construction documents *before* they could claim contractual relief because of financial adversity. Notably, the referee did not base his discharge of the plaintiffs on a finding that the parties had intended the termination clause in the contract to provide relief for the plaintiffs in the present circumstances. In invoking the doctrine of commercial impracticability, the referee determined that, although the contract unambiguously imposed on the plaintiffs a contractual duty to perform, the plaintiffs should nonetheless be excused from their nonperformance because of supervening circumstances.[15] The referee's earlier statements that other parts of section 301 were confusing did not contradict his implicit finding that the contract clearly made the submission of construction plans a condition precedent to recovering the deposit. Thus, we conclude that the trial court did not exceed its authority by impermissibly engaging in fact-finding contrary to the report of the referee.

## B

Finally we must decide whether the trial court erred as a matter of law in rejecting the referee's determination, endorsed by the plaintiff on appeal, that the impracticability doctrine excused Dills' failure to deliver construction plans to the agency. The plaintiff contends that Dills' inability to obtain such financing made submitting the construction plans a "futile" and "useless act," and therefore the doctrine of supervening imprac-

---

[14] See footnotes 3 and 4, supra.

[15] The referee stated flatly: "The duty of the plaintiff to provide full Construction Plans by December, 1974 was discharged by supervening impracticability." We disagree with the plaintiff's characterization of the referee's report as including a central finding of ambiguity to which the conclusion of impracticability was merely ancillary.

ticability discharged his duty to submit the plans. We hold, as did the trial court, that "[t]he doctrine of impracticability and impossibility . . . [is] not relevant to this case."

The impracticability[16] doctrine represents an exception to the accepted maxim of *pacta sunt servanda*, in recognition of the fact that certain conditions cannot be met because of unforeseen occurrences. Cf. *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 413, 538 A.2d 219 (1988). A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. 2 Restatement (Second), Contracts § 261; E. Farnsworth, Contracts (1982) § 9.6, p. 678. We discuss only the first two prongs of this test in disposing of the plaintiff's argument.

Although courts in recent years have liberalized the requirements for such an excuse; see G. Gilmore, The Death of Contract (1972) pp. 80–81; H. Berman, "Excuse for Nonperformance in Light of Contract Practices in International Trade," 63 Colum. L. Rev. 1413, 1414 (1963); only in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practical than initially contemplated. See, e.g., *Neal-Cooper*

---

[16] The doctrine of "impossibility" has come to include "physical impossibility," "frustration of purpose" and "impracticability" because of contingencies rendering performance more costly. See 6 A. Corbin, Contracts (1962) § 1325; 16 S. Williston, Contracts (3d Ed. Jaeger 1978) § 1932; G. Gilmore, The Death of Contract (1972) pp. 80–82. This case concerns only the last of these.

*Grain Co.* v. *Texas Gulf Sulphur Co.,* 508 F.2d 283, 294 (7th Cir. 1974) (party not allowed "to escape a bad bargain merely because it is burdensome"); *American Trading & Production Corporation* v. *Shell International Marine, Ltd.,* 453 F.2d 939, 942 (2d Cir. 1972) (closing of Suez Canal requiring charterer to sail nearly twice as many miles at a cost of nearly one third more than the contract price does not excuse performance); *United States* v. *Wegematic Corporation,* 360 F.2d 674, 676–77 (2d Cir. 1966) (duty of manufacturer to produce revolutionary computer system not excused because of "engineering difficulties" requiring two years and $1.5 million to correct); *Peerless Casualty Co.* v. *Weymouth Gardens,* 215 F.2d 362, 364 (1st Cir. 1954) (increased costs caused by the unexpected outbreak of war does not constitute superior force ending obligation of contract); *Matter of Westinghouse Electric Corporation,* 517 F. Sup. 440, 452–53 (E.D. Va. 1981) (duty to remove spent fuel not excused merely because reprocessing of the fuel became unprofitable); see also Connecticut General Statutes Annotated § 42a-2-614, comment 4; E. Farnsworth, supra, p. 680; 6 A. Corbin, Contracts (1962) § 1333; 16 S. Williston, Contracts (3d Ed. Jaeger 1978) § 1968; J. White & R. Summers, Uniform Commercial Code (2d Ed. 1980) § 3–9, pp. 131–32. Thus, the fact that preparing the construction plans would have cost Dills a great deal of money (more than the deposit he sought to recover) did not excuse him from submitting them as the contract provided.

Furthermore, the event upon which the obligor relies to excuse his performance cannot be an event that the parties foresaw at the time of the contract. We have previously held that "[t]he regular enforcement of conditions is . . . subject to the competing but equally well established principle that the occurrence of a condition may be excused in the event of impracticability

*'if the occurrence of the condition is not a material part of the agreed exchange* and forfeiture would otherwise result.' 2 Restatement (Second), Contracts § 271; 6 Corbin, Contracts (1962) § 1362; 5 Williston, Contracts (3d Ed. 1961) § 793." (Emphasis added.) *Grenier* v. *Compratt Construction Co.,* 189 Conn. 144, 148–49, 454 A.2d 1289 (1983); see also *West Haven Sound Development Corporation* v. *West Haven,* 201 Conn. 305, 313, 514 A.2d 734 (1986). Thus, the "central inquiry" is whether the nonoccurrence of the alleged impracticable condition "was a basic assumption on which the contract was made." General Statutes § 42a-2-615 (a);[17] 2 Restatement (Second), Contracts § 261;[18] E. Farnsworth, supra, § 9.6, pp. 679–84.

In this case the contingency upon which fulfilling the contract allegedly depended was Dills' obtaining the requisite financing. We cannot conclude, however, that Dills' failure to obtain financing was "an event the nonoccurrence of which was a basic assumption on which the contract was made." Indeed, section 702 (b) of the contract of sale demonstrates that the parties expressly contemplated that Dills might encounter financial

---

[17] General Statutes § 42a-2-615 (a) provides in pertinent part: "Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency *the nonoccurrence of which was a basic assumption on which the contract was made* or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid." (Emphasis added.) While the instant case does not concern the sale of goods, and therefore the Uniform Commercial Code does not apply, § 2-615 has been adopted by the Restatement and "promises to have a substantial influence on the law of contract generally . . . ." E. Farnsworth, Contracts (1982) § 9.6, p. 677.

[18] The Restatement (Second) of Contracts § 261 provides: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event *the non-occurrence of which was a basic assumption on which the contract was made,* his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." (Emphasis added.)

difficulties. The contract allowed Dills to terminate for this reason "after preparation of Construction Plans satisfactory to the Agency." If "an event is foreseeable, a party who makes an unqualified promise to perform necessarily assumes an obligation to perform, even if the occurrence of the event makes performance impracticable." E. Farnsworth, supra, p. 686.[19]

This case, like virtually every case involving discharge from an obligation to perform, concerns the issue of which party bears the loss resulting from an event that renders performance by one party uneconomical. See R. Posner, Economic Analysis of Law (3d Ed. 1986) pp. 93–94; R. Posner & A. Rosenfield, "Impossibility and Related Doctrines in Contract Law: An Economic Analysis," 6 J. Legal Stud. 83, 86–87 (1977). "Determining whether the non-occurrence of a particular event was or was not a basic assumption involves a judgment as to which party assumed the risk of its occurrence . . . . In making such determinations, a court will look at all circumstances, including the terms of the contract." 2 Restatement (Second), Contracts, c. 11, introductory note. "Since impossibility and related doctrines are devices for shifting risk in accordance with the parties' presumed intentions, which are to minimize the costs of contract performance, one of which is the disutility created by risk, they have no place when the contract explicitly assigns a particular risk to one party or the other." *Northern Indiana Public Service Co.* v. *Carbon County Coal Co.,* 799 F.2d 265, 278 (7th Cir. 1986); see also *Wasserman Theatrical Enterprise, Inc.* v. *Harris,* 137 Conn. 371, 374–75, 77 A.2d 329 (1950). Where, as in this case, sophisticated contracting parties have negotiated termination pro-

[19] Significantly, the defendants never conceded that the promised plans would have been of no use to them. Thus, it is far from certain that submitting the plans would have been a "futile act" from the defendants' point of view.

visions, courts should be slow to invent additional ways to excuse performance. We exercise such caution in this case.

There is no error.

In this opinion the other justices concurred.