[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
This is a contract dispute. In December, 1991, the parties entered into an agreement whereby the plaintiff undertook sewer line repairs and installation and road repairs on various streets in the City of Milford. The project was a considerable one, involving construction of some 6500 feet of sanitary sewers at a bid price of $677,801.00, based on unit or lump sum prices. Metcalf and Eddy ("M E"), an engineering firm, was named Engineer for the project.
The plaintiff substantially completed its work under the contract by May, 1993, and the defendant has paid for all work completed with the exception of the items contested in these proceedings.
 II
Plaintiff's Amended Complaint is in two counts. The first count alleges breach of contract by the defendant; the second count, unjust enrichment. At issue are six requests for change order by plaintiff which defendant disallowed in whole or in part. These six requests for change order are numbered #2, #5, #8, #9, #10 and #11. Claims #2 and #10 may be considered together, as may claims #5 and #9.
 III
Plaintiff's request for change order #11 was for extra work required to repair two damaged curb areas in the vicinity of the intersection of Maple and Meadow Streets. The claim is in the amount of $536.00. Defendant has refused to pay this claim, alleging that the curb damage was caused by the plaintiff. Mr. Sterback, assigned as an observer for the City of Milford's engineering department, testified he observed plaintiff's equipment damage one of the areas in question. (Exhibit R). Plaintiff's vice president, Mr. Tucker, testified as to his belief that the curb damage was caused by the gas company installing laterals. Plaintiff was unable to establish it was not responsible for said damage and the court will disallow this claim. CT Page 2689
 IV
Requests for change order numbers #2 and #10 have to do with claims by plaintiff for additional costs incurred in saw cutting pavement. Request #2, dated February 18, 1992, claims an amount of $20,991.18 for 9,752 linear feet of "Extra Depth" saw cutting. Request #10, dated July 7, 1992, claims an amount of $19,211.46 for another 4,744 linear feet. In putting together its bid, plaintiffs anticipated using a "pizza wheel" cutter at a cost of $.20 per linear foot. Plaintiffs relied on certain data in the bid documents (eleven boring logs) which indicated a pavement depth of .1 or .2 feet. On beginning work plaintiff encountered pavement thickness ranging from .4 to .6 feet. This required substitution of a "road saw cutter" for the "pizza wheel", at a cost of $2.25 per linear foot. Defendant's engineers, M E, denied both requests in their entirety, citing provisions of the contract.
Section IB.6 BIDDERS TO INVESTIGATE provides that:
 Bidders must satisfy themselves by personal examination of the site of the work and by such other means as they may wish, as to the actual conditions there existing, the character and requirements of the work, the difficulties attendant upon its execution, and the accuracy of all estimated quantities stated in the bid.
Section IB.7 INFORMATION NOT GUARANTEED states in pertinent part:
 All information given on the Drawings or in the other Contract Documents relating to subsurface and other conditions . . . is from the best sources at present available to the Owner. All such information is furnished only for the information and convenience of bidders and is not guaranteed.
 It is agreed and understood that the Owner does not warrant or guarantee that the subsurface or other conditions . . . will be the same as those indicated on the Drawings or in the other Contract Documents.
 It is further . . . understood . . . that no bidder or contractor shall use or be entitled to use any of the information made available to him or obtained in any examination made by him in any manner as a basis of or ground for any claim or CT Page 2690 demand against the Owner . . . arising from or by reason of any variance which may exist between the information made available and the actual subsurface or other conditions . . . actually encountered during the construction work . . .
Further, in Section B Bid, pp. B1 and B2 the plaintiff declares:
 (5) he understands that information relative to subsurface and other conditions . . . has been furnished only for his information and convenience without any warranty or guarantee, express or implied, that the subsurface and/or other conditions . . . actually encountered will be the same as those shown on the Drawings or in any of the other Contract Documents and he agrees that he shall not use or be entitled to use any such information . . . as a basis of or ground for any claim against the Owner . . . arising from or by reason of any variance which may exist between the aforesaid information made available or acquired by him and the subsurface and/or other conditions . . . actually encountered during construction work, and he has made due allowance therefor in this BID . . .
In the face of these contract provisions the plaintiff's claim must fail. A court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability (citations omitted), HollyHill Holdings v. Lowman, 226 Conn. 748, 756. The plaintiff has failed to establish such grounds here.
As to plaintiff's argument that "Everyone relies on the info provided by the City", Maskel Construction Co. v. Glastonbury,158 Conn. 592, is dispositive. In Maskel the plaintiff sought compensation for what it claimed was due it for services and materials under a sewer construction contract. The trial court found that it was the custom in the trade for an owner or a municipality to be charged the extra costs arising out of "conflicts" (situations where what is actually found in the ground differs from what is shown on the map or plans). Our supreme court, finding no factual basis to support the trial court's decision, went on to say: "Even if the existence of such a custom in the sewer construction trade had been approved, it nevertheless could not have varied the specific terms of the contract, Maskel Construction Co. v. Glastonbury, supra, at 596. CT Page 2691 Plaintiff's claim of "unforeseen circumstances" must fail. Plaintiff cites Dills v. Enfield, 210 Conn. 705, in support of his claim. But Dills stresses that "only in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practicable than initially contemplated." Dills v. Enfield, supra, at 717. The Dills court goes on to make the critical distinction: "If an event is foreseeable a party who makes an unqualified promise to perform necessarily assumes an obligation to perform even if the occurrence of the event makes performance impracticable." Thus, an event must be not only unforeseen, but unforseeable. Such was not the case here: the possibility of a variance in thickness of the pavement was clearly contemplated in the cited contract provisions. If such a possibility was unforeseen by the plaintiff it was clearly foreseeable. Plaintiff, in calculating its costs on the basis of using a "pizza wheel", "took its chances", Maskel Construction Co. v.Glastonbury, supra at 599. The plaintiff has failed to establish, by a fair preponderance of the evidence, any liability of defendant for costs reflected in Requests for Change Order #2 or #10.
 V
The plaintiff's Request for Change Order #8, dated April 22, 1992, is for additional compensation in the amount of $7,017.53 for extra work performed in removing and replacing "in situ" gravel base material, along Andrus Drive, Ray Bob Road and Plains Road on April 8, 9, 10 and 13, 1992. Plaintiff claims it was initially instructed to use the "in situ" (previously excavated) material as fill, but that after plaintiff had done so defendant's agent decided said material was unsuitable and directed plaintiff to remove it and replace it with new bank-run gravel. This happened after a rain which revealed the "in situ" material to be unsuitable. Plaintiff claims defendant's agent erred in directing defendant initially to use the "in situ" material. As a result, plaintiff claims it was required to do the same work twice and should be compensated for the extra work. Plaintiff acknowledges that the labor costs for backfilling are built into the unit price, but the work performed would, under the contract, entail either using "in situ" material or new bank-run gravel as the case might be; but would not include labor expended in removing material previously authorized by defendant's agent, then replacing the unsuitable material. CT Page 2692
Plaintiff argues that the added requirement constituted a material modification of the contract between the parties, requiring new consideration in the form of additional compensation for the plaintiff.
Defendant counters that plaintiff's claim was properly denied, citing Contract Section 3.02 GRAVEL-BASE COURSE which reads in pertinent part:
 If Engineer considers material at top of backfilled trenches or test pits unsatisfactory for use as pavement or sidewalk base course, remove and replace with acceptable bank-run gravel or gravel mixed with acceptable binding material.
This is precisely what was done here. Mr. Golden, the project manager for M E, testified that backfilling typically is done using excavated material. Then, the engineer makes a determination if the said excavated material is suitable or unsuitable. The engineer cannot make a determination until the excavated material has been backfilled in. The labor for removal and replacement of any "in situ" material deemed unsuitable is built into the unit price.
Based on the evidence presented, the court concludes that the labor for which |plaintiff is seeking additional compensation was work called for by the contract between the parties. The court finds that plaintiff has failed to establish, by a fair preponderance of the evidence, that the engineer's requirement that plaintiff remove and replace "in situ" material was a material modification of the contract, requiring additional compensation for the plaintiff. Plaintiff's claims under Request for Change Order #8 will be disallowed.
 VI
Plaintiff's Requests for Change Order #5 and #9 have to do with claims for additional compensation for paving areas of the roadway beyond those which would ordinarily have been paved in the course of completion of sewer construction work. Request #5 was in the amount of $28,879.00 for additional binder course permanent paving due to a gas main trench installed adjacent to the sewer trench in some areas. Defendant allowed $9,431.00 on this request. Request #9 was for additional binder course permanent paving required due to poor existing paving (alligatoring) in some areas. The claim was in the amount of CT Page 2693 $20,805.25. The defendant allowed $3,116.74 on this request.
The dispute between the parties centers around the "payment width" of the sewer trenches utilized in calculating the additional compensation due plaintiff for pavement performed beyond the width of said sewer trenches. The narrower the trench, the better for the plaintiff; the wider the trench the better for the defendant. The defendant utilized a payment width of six feet (6') in calculating its claims. The defendant utilized a payment width of nine feet (9').
The parties utilized the same methodology to calculate payments for additional binder course pavement, namely to deduct the "payment width" from the actual width of binder course pavement, convert the result into linear feet then apply the unit price to the linear feet. In putting together its bid plaintiff had utilized a six foot"payment width."
By letter dated February 27, 1992, plaintiff's vice president notified the Engineer by letter that plaintiff would utilize an "anticipated trench width" of six feet. The binder course paving, including the additional work occasioned by the gas line installation and the areas of poor paving ("alligatoring") was performed in the period March-April 1992. The Request for Change Order #5 was submitted, dated May 1, 1992. The Request for Change Order #9 was submitted, dated May 12, 1992.
By letter dated May 21, 1992 M E acknowledged that additional paving was required, both because of proximity of the gas trench (Request #5) and the poor condition of the road in the certain areas (Request #9). However, the Engineer rejected the use of an anticipated width of six feet as "invalid." The Engineer returned marked over copies of the two requests, substituting a nine foot width and recalculating on that basis.
The Engineer calculated the additional binder course paving required, utilizing a series of measurements performed by its agent, averaging them and rounding off to nine feet. His method was to measure the completed paving from the marked center line of the sewer to the pavement edge on the side away from the gas line, then double that reading to establish the pavement width occasioned by the sewer trench, without reference to any additional width occasioned by any gas line encroachment.
VII
CT Page 2694
Plaintiff argues that it should be compensated for the additional binder course paving work on the basis of the six foot payment width. Defendant's vice president took issue with the measurements on which defendant relied and offered several photographs supporting his claim that a six foot width was realistic. The photographs are inconclusive. There were certainly areas where the paving occasioned by the sewer trench required six feet or less of paving. Engineer's agent measurements show six feet at certain points but his measurements averaged out at over nine feet.
Plaintiff regards defendant's lack of response to plaintiff's announced intent to utilize an "anticipated width" of six feet as an acceptance by silence, analogous to "an admission made by silence". Further, under contract theory, plaintiff argues, "It is axiomatic that regardless of a party's stated intent, if he conducts himself so as to lead the other party reasonably to conclude that he is accepting an offer to contract, acceptance has taken place as a matter of law, "Robert Petereit. et al v.S.B. Thomas. Inc., 63 F.3d 1169, 1178 (2nd cir. 1995).
The court is not persuaded. Under contract provision CA-4AUTHORITY OF THE ENGINEER, the plaintiff agreed that:
 "The Engineer shall be the sole judge of the intent and meaning of the Drawings and Specifications and his decisions thereon and his interpretation thereof shall be final, conclusive and binding on all parties."
Here, the Engineer determined the payment width to be utilized in seeking compensation for extra work based on actual measurements of said paving. Unless plaintiff can show the Engineer acted arbitrarily or in bad faith, the court is not authorized to substitute its judgment for that of the designated expert, John T. Brady Co. v. Stamford, 220 Conn. 432, 450. The court finds defendant's calculation of payment width was based on a rational methodology. Defendant's actions with regard to payment width were neither arbitrary nor made in bad faith.
The court finds that the defendant's lack of response to plaintiff's letter of February 27, 1992, announcing plaintiff's intent to utilize an anticipated width of six feet as its payment width for that additional work was neither an acquiescence by silence or an acceptance of a contract modification. Defendant's CT Page 2695 rejection of plaintiff's payment width was not untimely. At issue was not whether additional work should be done, but rather how to calculate payment for that additional work. Indeed, the plaintiff, while protesting defendant's decisions regarding plaintiff's requests for change order, failed to follow the objection procedure required by CA-4 AUTHORITY OF THE ENGINEER.
The court finds that the plaintiff has failed to establish, by a fair preponderance of the evidence, the defendant's liability for additional payments under Requests for Change Order #5 and #9.
 IX
Plaintiff's Second Count alleges unjust enrichment. Unjust enrichment applies "`wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available for action on the contract,' 5 Williston, Contracts (Rev. Ed.), S. 1479." "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in any given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." Providence Electric Co. v. SuttonPlace. Inc., 161 Conn. 242, 246.
Such is not the case here. Plaintiff has failed to establish, by a fair preponderance of the evidence, its claim of unjust enrichment.
Plaintiff has failed to establish, by a fair preponderance of the evidence, its claims against the defendant. Accordingly, judgment may enter for the defendant.
By the Court
Downey, J.