EMPIRE PAVING, INC. *v.* CITY OF MILFORD
(AC 18233)

Spear, Mihalakos and Daly, Js.

Argued September 29, 1999—officially released April 11, 2000

*Dominic J. Caciopoli*, for the appellant (plaintiff).

*Matthew B. Woods*, with whom, on the brief, was *Cynthia C. Anger*, assistant city attorney, for the appellee (defendant).

*Opinion*

SPEAR, J. The plaintiff, Empire Paving, Inc. (Empire), appeals from the judgment of the trial court rendered in favor of the defendant, the city of Milford (city), on Empire's claim that the city breached the parties' sewer construction contract. Empire claims that the trial court improperly rejected its claims for additional compensation for (1) extra paving work that was approved by the city and (2) higher than anticipated pavement cutting costs that resulted from Empire's reliance on the

city's inaccurate boring logs. We affirm the judgment of the trial court.[1]

The trial court found the following facts. On December 2, 1991, Empire and the city entered into a contract pursuant to which Empire agreed to install 6500 linear feet of sewage pipe for $677,801. Empire claimed that it was entitled to additional compensation for paving that was beyond that called for in the contract.[2] Change order request number five was in the amount of $28,879 for additional paving that was caused when a newly dug gas main trench "slid" into the sewer trench in some areas. The city allowed $9431 in additional compensation on this change order. Change order request number nine, in the amount of $20,805.25, was for repairing areas adjacent to the sewer trenches that were in poor condition. The city allowed $3116.74 on this request. The conditions reflected in these two change orders necessitated a greater width of paving than was originally anticipated in the contract.

Change order request numbers two and ten relate to Empire's claims for additional costs incurred in cutting the pavement with a saw. When Empire encountered

[1] Empire also claims that the trial court improperly relied on paragraph three of § IB.7 of the contract, discussed in part II of this opinion, because that clause violates public policy. This claim was not raised in the trial court, and we therefore decline to review it. Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial . . . ."

[2] Section CA.25 of the contract provides for extra work and payment for such work. The first paragraph of § CA.25 provides: "The Contractor shall perform any extra work (work in connection with the Contract but not provided for herein) when and as ordered in writing by the Engineer, at the unit prices stipulated in the Contract for such work or, if none are so stipulated, either (a) at the price agreed upon before such work is commenced and named in the written order for such work, or (b) if the Engineer so elects, for the reasonable cost of such work, as determined by the Contractor and approved by the Engineer, plus a percentage of such cost, as set forth below. No extra work shall be paid for unless specifically ordered as such in writing by the Engineer."

pavement thicknesses ranging from 0.4 to 0.6 feet, as opposed to depths of 0.1 to 0.2 feet indicated in the city's boring logs, it was required to use a "road saw cutter" instead of a "pizza wheel"[3] at an additional cost of $2.05 per linear foot. Request number two in the amount of $20,991.18 was for a claimed 9752 linear feet of "extra depth" saw cutting. Request number ten in the amount of $19,211.46 was for another 4744 linear feet of such cutting. Metcalf and Eddy, Inc. (engineers), the engineering firm designated in the contract, denied both of the change order requests.

Empire brought suit, claiming, inter alia, breach of contract with respect to change orders two, five, nine and ten. The trial court rendered judgment for the city, and this appeal followed.

I

Empire first claims that it was entitled to additional compensation for extra paving as per change order requests numbers five and nine. The trial court concluded that the amounts allowed by the city were proper.

The court found: "The dispute between the parties centers around the 'payment width' of the sewer trenches utilized in calculating the additional compensation due [Empire] for paving performed beyond the width of said sewer trenches. The narrower the trench, the better for [Empire]; the wider the trench, the better for the [city]. [Empire] utilized a payment width of six feet (6') in calculating its claims. The [city] utilized a payment width of nine feet (9')."

Empire notified the engineers by letter dated February 27, 1992, that it intended to use a trench width of

---

[3] A pizza wheel is a circular device that is used to cut pavement up to a certain thickness. It is less expensive to use than a road saw cutter, which is used to cut thicker pavement.

six feet. Change order request number five, relating to the gas main trench, was not submitted until May 1, 1992, and change order request number nine, relating to the repair of adjacent paving, was submitted on May 12, 1992. The work described in the change order requests was performed during March and April, 1992. The engineers notified Empire by letter dated May 21, 1992, that the additional pavement was indeed required, but rejected the six foot payment width as "invalid." The engineers substituted a nine foot width and calculated the amount due on that basis.

First, we address our standard of review and, thereafter, the reviewability of Empire's claims.[4] With regard to the trial court's factual findings, the clearly erroneous standard of review is appropriate. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). The trial court's legal conclusions are subject to plenary review. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." Id., 221. Where the contract language relied on by the trial court to resolve the dispute is definitive, the interpretation of the contract is a matter of law and our review is plenary. *Chance* v. *Norwalk Fast Oil, Inc.*, 55 Conn. App. 272, 280, 739 A.2d 1275, cert. denied, 251 Conn. 929, 742 A.2d 361

---

[4] Empire presents a mixture of claims without adverting to the standard of review with respect to each claim. Practice Book § 67-4 (d) provides in relevant part: "The argument on each point shall include a separate, brief statement of the standard of review the appellant believes should be applied . . . ."

(1999); *Days Inn of America, Inc.* v. *161 Hotel Group, Inc.*, 55 Conn. App. 118, 124, 739 A.2d 280 (1999).

Empire's claim is that change order requests five and nine were, in fact, offers to enter into a separate contract that the city accepted by its silence, thereby creating "a separate binding agreement to perform additional work." The operative amended complaint on which the parties proceeded to trial alleges a breach of the existing sewer construction contract and makes no claim that there was a separate binding contract created by the city's silence in the face of the change order requests. Because this claim was not presented to or decided by the trial court, we decline to review it. See *HLO Land Ownership Associates Ltd. Partnership* v. *Hartford*, 248 Conn. 350, 361, 727 A.2d 1260 (1999); *Polizos* v. *Nationwide Mutual Ins. Co.*, 54 Conn. App. 724, 732, 737 A.2d 724, cert. granted on other grounds, 251 Conn. 916, 740 A.2d 865 (1999).

In resolving Empire's alternative claim that the city wrongfully refused to pay the amounts claimed on change orders five and nine in breach of the sewer construction contract, the trial court relied on § CA.4 of the contract. That section is titled, "Authority of the Engineer," and it provides in relevant part that "[t]he Engineer shall be the sole judge of the intent and meaning of the Drawings and Specifications and his decisions thereon and his interpretation thereof shall be final, conclusive and binding on all parties. . . ."

We conclude that § CA.4 of the contract defeats Empire's claim. That clause required Empire to send a written protest to the city within ten days of the engineers' decision as to payment width if it disagreed with the nine foot determination. Section CA.4 provides in relevant part: "[U]nless the Contractor files such written protest . . . within such ten (10) day period, he shall be deemed to have waived all grounds for protest

of such direction, instruction, determination, or decision . . . ." The trial court viewed Empire's failure to protest the engineers' decision as fatal to its claims. We agree because the plain language of § CA.4 permits no other result.

Empire also claims that, pursuant to § CA.28 of the contract, the engineers did not have authority to resolve the change order requests but merely to pass them on with a recommendation to the owner. Section CA.28[5] provides a procedure for resolving claimed breaches of the contract and has nothing to do with processing change order requests. Change order requests were permitted by the contract, as previously noted, and cannot be classified as claims for damages for breach of the contract.

Empire further contends that its claims should not be precluded because the engineers' measurements were arbitrary and not done in good faith. The trial court found to the contrary.

Empire's primary attack on this finding is that the city allowed the trenches to be covered up before responding to the change order requests. The trial court found that the change order requests were submitted *after* the work was completed. This finding is supported by the evidence and is not clearly erroneous.

Empire also contends that the engineers' measurements were "demonstrably wrong." This claim failed in the trial court because the court concluded that the photographs that Empire relied on to support its

---

[5] Section CA.28 provides in relevant part: "If the Contractor makes claim for any damages alleged to have been sustained by breach of contract . . . he shall, within ten (10) days after occurrence of the alleged breach . . . file with the Engineer a written, itemized statement . . . . Within ten (10) days after the timely filing of such statement, the Engineer shall file with the Owner one copy of the statement, together with his recommendations for action by the Owner . . . ."

claimed payment width were "inconclusive." The court also noted that the "[e]ngineer[s'] agent's measurements show six feet at certain points but his measurements averaged out at over nine feet." Our review of the evidence leads us to conclude that the trial court's findings that the engineers' measurements were rational and not done in an arbitrary manner were not clearly erroneous.

## II

Empire also claims that it should be compensated for additional costs that it incurred in cutting the pavement because it relied on the inaccurate boring log information provided by the city to estimate the cost of such pavement cutting. On the basis of the city's boring logs that showed pavement depths of 0.1 and 0.2 feet, Empire estimated that a pizza wheel[6] would be sufficient to cut through the pavement.

Our review of the trial court's legal conclusion that the contract language on this issue was definitive and barred Empire's claims is plenary. See *Chance* v. *Norwalk Fast Oil, Inc.*, supra, 55 Conn. App. 280. The trial court properly determined that §§ IB.6 and IB.7 of the construction contract bar Empire's claims.

Section IB.6 of the construction contract provides that "[b]idders must satisfy themselves by personal examination of the site of the Work and by such other means as they may wish, as to the actual conditions there existing, the character and requirements of the Work, the difficulties attendant upon its execution, and the accuracy of all estimated quantities stated in the Bid." Section IB.7 provides in relevant part: "All information given on the Drawings or in the other Contract Documents relating to subsurface and other conditions . . . is from the best sources at present available to

---

[6] See footnote 3.

the Owner. All such information is furnished only for the information and convenience of bidders and is not guaranteed . . . ." That section goes on to provide: "It is agreed and understood that the Owner does not warrant or guarantee that the subsurface or other conditions . . . will be the same as those indicated on the Drawings or in the other Contract Documents . . . ."

Yet another part of § IB.7 provides that "[i]t is further . . . understood that no bidder or contractor shall use or be entitled to use any of the information made available to him or obtained in any examination made by him in any manner as a basis of or ground for any claim or demand against the Owner . . . arising from or by reason of any variance which may exist between the information made available and the actual subsurface or other conditions . . . actually encountered during the construction work . . . ."[7]

Empire mounts a twofold attack on the court's conclusions. First, Empire claims that these contract clauses present an ambiguity that should have been resolved by resort to the parties' contentions concerning their respective understandings of the agreement. The claimed ambiguity is that the city represented that the information provided as to pavement thickness was the best available, although it knew that the information was not the best available and was in fact wrong. Second, Empire claims that these clauses should not be dispositive because, as a practical matter, bidders cannot be expected to tie up municipal streets to do their own test borings. Empire asserts that these clauses should, therefore, be disregarded where actual conditions are different from conditions that were anticipated on the basis of the city's information. We will address these contentions in turn.

---

[7] It is this clause that Empire attacks as violative of public policy and, therefore, unenforceable. The claim is not reviewable, as noted in footnote 1.

We first reject the ambiguity claim because we conclude that the contract language clearly and unambiguously provided that bidders could not rely on information provided by the city to support a claim such as this one. Pursuant to the plain language of the contract, bidders were warned to satisfy themselves as to existing conditions and the requirements of the work. Section IB.7 specifically states that the city neither warrants nor guarantees that the "subsurface or other conditions" will be as indicated in the contract documents furnished by the city. These clauses are dispositive of Empire's claim.

The second aspect of this claim must also fail. In *Dills* v. *Enfield*, 210 Conn. 705, 717, 557 A.2d 517 (1989), our Supreme Court decided that "only in the most exceptional circumstances have courts concluded that a duty is discharged because additional financial burdens make performance less practical than initially contemplated." In an earlier case, the court rejected a similar claim that contract language can be disregarded where the contractor encounters a situation that is different from what was expected on the basis of information provided by the municipality. In *Maskel Construction Co.* v. *Glastonbury*, 158 Conn. 592, 596, 264 A.2d 557 (1969), our Supreme Court held that the trial court improperly resorted to evidence of a custom in the trade that required an owner or a municipality to pay extra costs arising out of "conflicts." Such conflicts represented the difference in the actual conditions that were found by the contractor and the information that was shown on the owner's maps or plans. The Supreme Court held that "[e]ven if the existence of such a custom in the sewer construction trade had been proved, it nevertheless could not vary the specific terms of the contract . . . ." Id. Here, Empire is asking us to do that which our Supreme Court has forbidden.

The judgment is affirmed.

In this opinion the other judges concurred.