These five cases all involve the estate of, George P. Elgar who died intestate on November 28, 1990, at the age of 55, as a result of an automobile accident. at the time of his death, the decedent was a resident of Westport, and was survived by his wife, the plaintiff, Pamela F. Elgar. There were no issue of their marriage. The decedent was also survived by two adult children of a prior marriage, Eric M. Elgar and Marie Elgar Hopper. Mr. Elgar was appointed by the Westport Probate Court as the administrator of his father's estate, and both he and his sister are parties in the first captioned case.
The first action involves the approval by the Westport Probate Court of a prenuptial agreement between the plaintiff and the decedent, executed on September 23, 1988, two days before their marriage on September 25, 1988. The plaintiff alleges that she is aggrieved by the decision because it deprives her of her statutory share of her husband's estate, and she appeals to this court pursuant to General Statutes § 45a-186.[1] This first action also included an objection to the appointment of Eric M. Elgar as administrator. The second action is an application by the plaintiff, under General Statutes § 45a-321(b), for an award of exclusive occupancy of premises located at 1 Franklin CT Page 1276 Lane, Westport. The Probate Court in Westport denied this request on the ground that plaintiff was living in New York and was not part of decedent's household at the time of his death. The third action is an appeal from the appointment of the decedent's son, Eric M. Elgar, as administrator of his father's estate. The fourth action is not a probate appeal, but rather involves title to certain items of jewelry which plaintiff claims belong to her and Magnolia Levy, her daughter from a prior marriage. This action also concerns an inter vivos family trust established by decedent as settlor, dated August 2, 1990, of which the plaintiff was a co-trustee along with her late husband. Plaintiff claims that the trust owns certain bonds and a bank account which the administrator, Eric M. Elgar, refuses to turn over to her as surviving trustee. Also at issue in the fourth action is title to a 1982 Mercedes Benz. The fifth action is an appeal from the approval or allowance by the Westport Probate Court of a final accounting submitted by Westport Bank Trust Company, which was appointed on March 7, 1991 as temporary administrator of the decedent's estate.
The parties stipulated that all five actions should all be consolidated for trial. Since the parties also agreed that the first issue to be determined is the legality and enforceability of the prenuptial agreement between the plaintiff and the decedent, this memorandum of decision addresses only this issue and pertains only to the first of the above captioned actions.
The prenuptial agreement, which was executed in the presence of a witness and acknowledged before a notary public, and admitted as an exhibit in the trial of this case, provides, among other things, that both plaintiff and decedent could own, hold and freely dispose of all real and personal property owned at the time of the agreement or acquired thereafter by gift, free from all rights of the other; that each party could dispose of all real and personal property upon death by will, testamentary substitute, or any other arrangement as if the parties had never been married; that each party waived, released and renounced all interest in the other party's estate; and that neither party would contest the will of the other. The agreement also states that the plaintiff waived the right to legal counsel and acknowledged that in light of the voluntary and knowledgeable nature of the waiver, she would not claim that the agreement is void and unenforceable. Furthermore, the agreement provides that both parties acknowledge that the agreement was fair, equitable, entered into voluntarily, and not as a result of duress or undue CT Page 1277 influence. In addition, plaintiff waived her right to act as fiduciary of Mr. Elgar's estate. The agreement also provides that it is to be construed according to the laws of the state of New York.
Plaintiff contends in her reasons of appeal that she signed the prenuptial agreement only two days before her wedding, that she was preoccupied with wedding plans, and consequently only glanced at the document before initialing each page and signing the agreement. The plaintiff also argues that she did not consult a lawyer concerning the agreement, and that she had been advised that the document only pertained to distribution of Mr. Elgar's estate in the event of a divorce, rather than death, because the decedent had been divorced twice prior to his marriage to the plaintiff. The plaintiff further claims that she signed the prenuptial agreement under duress and with lack of informed consent; that the agreement was the result of lack of good faith on the part of the decedent and his attorneys; that the agreement is unconscionable and ambiguous; and that the decedent had both verbally and in writing expressed his intention to revoke the agreement.
The defendants denied the material allegations of the plaintiff's reasons of appeal and asserted two special defenses. The first claimed that the prenuptial agreement stated that it contained the entire understanding of the parties, and could only be amended or revoked by an instrument in writing. The second special defense contended that the plaintiff had no standing to contest the appointment of Eric Elgar as administrator of his late father's estate.
The case was referred to Attorney Howard C. Kaplan, an attorney trial referee, in accordance with General Statutes §52-434(a)(4) and Practice Book § 428 et seq., to be heard as a trial de novo. General Statutes § 45a-186. See Bristol v.Brundage, 24 Conn. App. 402, 407, 589 A.2d 1 (1991). The attorney trial referee conducted a trial and then filed a thoughtful and detailed report with over forty findings of fact, recommending that judgment enter for the defendants. The referee's findings of fact may be summarized as follows: (1) that on September 22, 1988, the decedent told the plaintiff that she was to sign a prenuptial agreement at his lawyer's office the next morning, on September 23, 1988; (2) that on the date the prenuptial agreement was to be signed, the wedding invitations had already been sent and acceptances received; (3) that the plaintiff had not seen the CT Page 1278 agreement prior to her arrival at the decedent's lawyer's office on the morning of September 23, 1988, a day which the referee characterized as very busy for the plaintiff, with business matters, preparation of a trip to Africa, and the making of arrangements for the wedding to be held two days later; (4) that the plaintiff testified that she thought the agreement applied only in the event of divorce, and not in the case of death, but conceded that she would have signed the agreement in any event because the refusal to do so would jeopardize her impending marriage, and that she had told certain friends of — hers that she would sign the agreement because she knew it would please the decedent; (5) that the husband's lawyer, Attorney S. J. Corriss, went over the agreement with the plaintiff "hastily" and pointed out that it included a "waiver of rights against one another's estate", and that the agreement was to be interpreted according to the laws of the state of New York, although he did not explain to her what that meant as contrasted with applying the law of this state; (6) that at the attorney's office the plaintiff did not read the agreement line by line, but simply flipped through its eleven pages quickly; (7) that before the agreement was signed, the plaintiff and the decedent wrote out by hand the financial information referred to in the agreement, and that such financial information was disclosed by the decedent to the plaintiff only under pressure from his lawyers; (8) that Corriss either knew, or should have known, that the plaintiff did not "effectively" read the agreement, while cognizant that the plaintiff was not represented by counsel at the time she signed the agreement, and Corriss knew that the hasty signing did not conform to the practices of his law office and had in fact received a note from a colleague indicating "I am disturbed by the combination of no counsel and no financial disclosure," although the later was cured at the time of signing; (9) that Corriss had the plaintiff sign a letter indicating that she had been advised on prior occasions to obtain the services of a lawyer, and that both Corriss and the decedent knew that this letter was "untrue", because she had not been so advised, although the letter did not induce action by the plaintiff nor did she rely on it;[2] (10) that plaintiff did not have an adequate opportunity to procure an attorney in the period between being told by the decedent to sign the agreement and the actual signing of the agreement the next morning; (11) that neither Corriss nor his client, the decedent, made any false representations to the plaintiff; (12) that the plaintiff resided in and was a domiciliary of the state of New York at the time she executed the agreement, as well as after the wedding, and all her CT Page 1279 connections were in that state, including the conducting of a business in New York, except for weekend and holiday visits to the decedent's Connecticut residence; (13) that she was an experienced businesswoman, who had been married previously; and (14) that the discussion concerning the signing of the agreement and the execution of the agreement both took place in New York.
The attorney trial referee drew the following conclusions from these findings of fact: (1) that it would have been impossible for the plaintiff to have understood the agreement, the side letter of September 22, 1988, and the financial disclosure, all within the limited time period during which she was in the decedent's lawyer's office; (2) that the September 22, 1988 letter from Corriss to the plaintiff was irrelevant, did not constitute a meaningful waiver of counsel, and did not play any part in the referee's conclusions and recommendations; (3) that neither the decedent nor his lawyer made any untruthful statements to the plaintiff regarding the agreement; (4) that the decedent's attorney and the decedent himself did not deceive or defraud the plaintiff regarding the fact that the agreement applied in the event of the decedent's death; (5) that the agreement was discussed and executed in New York, the agreement itself states that it is to be construed according to the laws of New York and, accordingly, New York law applies to the interpretation of this agreement; (6) that there was no proof by the plaintiff of "fraud, misrepresentation, duress or undue influence"; and (7) that under New York law the agreement was valid because plaintiff did not establish that it was induced by "fraud, concealment, imposition or overreaching."
In an accompanying memorandum, the attorney trial referee expanded on these findings and conclusions by emphasizing the following: (1) that the agreement was not the product of fraud, misrepresentation, duress or undue influence, but rather that the "plaintiff wished to sign the agreement and get on with her wedding and life regardless of what the agreement said or did not say"; (2) that with respect to the parties' choice of New York law in the agreement itself, Connecticut law agrees with 1 Restatement (Second), Conflict of Laws, § 187 (1971), that parties are free to choose their own forum except under two circumstances, viz., (a) if New York had no substantial relationship to the matter, or (b) if New York law was contrary to our fundamental policies and law, and this state had a materially greater interest than New York in determining the controversy, and that neither such exception applies in the CT Page 1280 present case;[3] (3) that New York has a substantial relationship to the parties because, in addition to the plaintiff being a domiciliary thereof, and the fact that the agreement itself was discussed and executed in New York, the decedent himself had substantial contacts with New York, as he lived there during the week with the plaintiff, and conducted his business in that state; (4) that for the same reasons, New York had at least the same interest in this controversy as this state; (5) that even if the parties had not made an effective choice of law, New York had the most significant relationship to the transaction in issue and to the parties, in that the signing and discussion of the agreement took place in New York, the plaintiff lived in New York, the decedent had close connections with that state, and therefore "in balance the interest of the State of New York in the antenuptial agreement was stronger that of Connecticut"; (6) that New York law, as reflected in Sunshine v. Sunshine,51 App.Div.2d 326, 381 N.Y.S.2d 260, aff'd 40 N.Y.2d 875, 389 N.Y.2d 344,357 N.E.2d 999 (1976), is more lenient that Connecticut law with regard to upholding a prenuptial agreement, in that if such an agreement is duly executed, it is presumed to be legal, just like any other contract, and is not presumed to be fraudulent regardless of its lack of fairness and reasonableness, but may be set aside only on proof of concealment or imposition or fraud; (7) that in Connecticut, on the other hand, under McHugh v.McHugh, 181 Conn. 482, 486-87, 436 A.2d 8 (1980), all the circumstances of the execution of the agreement are considered, the parties thereto are deemed to be in a confidential relationship that "calls for the exercise of good faith, candor, and sincerity," and factors such as full disclosure, mutual representation by counsel, and an understanding of what is being signed are all considered, which, according to the referee, would result in the failure of the Elgar agreement "were the law of Connecticut to apply."
Pursuant to Practice Book § 438, the plaintiff filed a motion requesting that the attorney trial referee correct his report to reflect that: (1) the plaintiff and the decedent lived together for four years prior to their marriage; (2) the decedent was a resident of the state of Connecticut at his death, and the right to inherit from his intestate estate is Governed by Connecticut law; (3) there were no negotiations regarding the contents of the prenuptial agreement; (4) the only reasons the plaintiff did not read the agreement were time constraints and pressure on her in the decedent's lawyer's office, and additionally, she had not made a conscious decision before CT Page 1281 arriving in the office not to read the document; (5) she thought the agreement pertained only to a divorce, because the decedent had explained to her that he had two previous acrimonious divorces, and she was uncertain whether she would or would not have signed the agreement had she been advised and realized that it also applied in the event of Mr. Elgar's death; (6) duress and undue influence were inflicted on the plaintiff in that she was given no reasonable opportunity to obtain her own lawyer, and the explanation of the agreement by Corriss was confined to a minute or a minute and a half: (7) Corriss and the decedent acted: bad faith and did not tell the entire truth to the plaintiff because she was not advised about the differences between New York and Connecticut law regarding such agreements, was not advised about her entitlement to a widow's share in the event of death, and was never sent a copy of the agreement after it was executed; (8) since a prima facie showing of duress and undue influence has been made, the burden of proving the enforceability of the agreement shifted to the defendants, because fraud is men presumed and the party offering the agreement "has the burden of establishing its fairness under rigid scrutiny"; (9) because the plaintiff was afforded insufficient time to hire an attorney, she had not made a genuine decision to waive her right to counsel; (10) a confidential relationship exists between parties to a prenuptial agreement, and this was breached by the decedent; (11) whether there has been meaningful and effective consent to an agreement is to be construed according to the laws of the forum, in this case the state of Connecticut, and the validity of this agreement could not be upheld in Connecticut because of the lack of such consent, and because Connecticut requires "good faith, candor and sincerity" with respect to such an agreement; and (12) Connecticut has the greatest interest in this controversy because the decedent resided and died in Connecticut, his estate is being probated pursuant to the laws of this state, and the wedding itself occurred in this state.[4]
In response to the plaintiff's motion to correct, the referee issued a supplemental report in which he declined to make any corrections to the conclusions contained in his original report, or to change his recommendation that judgment enter in favor of the defendants, but he did make the following corrections to his findings of fact: that the plaintiff and the decedent did live together for four years prior to their wedding; that the prenuptial agreement was drafted exclusively by the decedent's attorney; that the decedent had several businesses; that the decedent had two previous bad divorce experiences; that there CT Page 1282 were no negotiations as such regarding the agreement; that the decedent's estate is being administered in the Probate Court in Westport according to Connecticut law, including the right of inheritance; that the decedent's lawyer was a specialist in estate and family law; that the lawyer's explanation of the agreement to the plaintiff lasted about a minute to a minute and a half, and it would take an intelligent person about an hour with the help of a professional to understand the agreement; that the manner of execution of the agreement made decedent's attorney professionally uncomfortable and that it departed from the procedures and policies of his law firm, including the firm's usual insistence that each party to such an agreement be represented by his or her own counsel with a full opportunity to understand such an agreement; that the decedent's lawyer did not advise the plaintiff about her right of election or to a widow's allowance; and that the plaintiff was never provided with a copy of the signed agreement.
As to this court's standard of review of an attorney trial referee's findings of the facts of a given case, the Supreme Court has stated that: (1) the trial court may not "retry the case"; and (2) a court may not find additional facts or reject facts found by the referee unless, in the words of Practice Book § 439, "a material fact has been found without evidence or the [referee] has failed to find an admitted or undisputed fact, or has found a fact in such doubtful language that its real meaning does not appear." Dills v. Town of Enfield,210 Conn. 705, 714, 557 A.2d 517 (1989). Furthermore, a trial court may not engage in "fact-finding contrary to the report of the referee." Id., 716. Thus, generally this court's task consists of, first, determining whether "there was . . . evidence to support the attorney trial referee's factual findings," and, second, whether "the conclusions reached were in accordance with the applicable law." Thermoglaze, Inc. v. Morningside Gardens Co.,23 Conn. App. 741, 746, 583 A.2d 1331, cert. denied, 217 Conn. 811,587 A.2d 153 (1991). In the present case, however, the plaintiff did not file exceptions asking this court to correct the report. Practice Book § 439. It follows therefore that the factual findings by the referee must stand uncorrected. Ruhl v. Town of Fairfield,5 Conn. App. 104, 106, 496 A.2d 994 (1985) (the court's role is "limited to determining whether the subordinate facts were sufficient to support the ultimate factual conclusions."). A failure to file exceptions constitutes a waiver of the right to "attack the subordinate factual findings contained in the report." See Bernard v. Gershman, 18 Conn. App. 652, 655, CT Page 1283559 A.2d 1171 (1989) (holding that a failure to file a motion to correct waived the right to challenge the referee's subordinate factual findings).
The plaintiff did file objections to the acceptance of the attorney trial referee's report, Practice Book § 440, in which she contended that: (1) the attorney trial referee erred in not finding that under New York law, a "confidential relationship" arise between parties to a prenuptial agreement, and that once some evidence of overreaching is presented, the burden of proof shifts to the proponent of the agreement to demonstrate its fairness; (2) that the plaintiff never made an informed, free and willing choice of New York law to govern the interpretation of the agreement; (3) that Connecticut law should apply to this agreement and the issue of whether the plaintiff's consent thereto was obtained by improper means, because the real issue in the case is whether a widow of a Connecticut domiciliary effectively waived her right to inherit from the decedent's estate; and (4) that Connecticut law provides that the parties to such an agreement are in a confidential relationship requiring "the utmost good faith, candor, and sincerity" in all matters bearing on the agreement.
Since a trial court must accept the referee's findings of fact in the absence of any exceptions to the report, its task is to determine whether the referee's conclusions "are legally and logically correct and whether they find support in the facts found by the referee." Bernard v. Gershman, supra, 18 Conn. App. 656; Practice Book § 440. "Where evidence is in conflict, its probative force is for the trier of fact to determine." Id.
In the present case, the attorney trial referee determined that under the criteria of the Restatement, the parties' choice of law, as reflected in the prenuptial agreement, is valid and not subject to any of the exceptions mentioned therein. This conclusion rests on the premise that New York did have significant contacts with the plaintiff and the decedent, and with respect to the instrument whose validity is being challenged by the plaintiff. The referee also pointed out that the enactment of § 18 of the New York Decedent Estate Law changed previous law by providing for a written release or waiver of one's rights in the form of a prenuptial agreement, thus revoking the presumption of fraud referred to in the older cases. As stated inSunshine v. Sunshine, supra, 381 N.Y.S.2d 261, "a duly-executed ante-nuptial agreement is given the same presumption of legality CT Page 1284 as any other contract, commercial or otherwise. It is presumed to be valid in the absence of fraud." See also Panossian v.Panossian, 172 App.Div.2d 811, 569 N.Y.S.2d 182, 184 (1991). The referee determined after listening to the witnessed that neither the decedent nor his lawyer practiced fraud on the plaintiff. Specifically, the referee concluded that while the decedent and his lawyer pressured the plaintiff in an unseemly fashion, nevertheless, they did not make any false representations to her, nor were they guilty of concealment, imposition or overreaching, and finally that although the plaintiff was free to decline to execute the prenuptial agreement, she made a conscious decision to sign it under the circumstances.
The attorney trial referee's conclusions appear to follow legally and logically from his underlying findings of fact, Practice Book § 440, and thus the court agrees with his recommendation that judgment should enter in favor of the defendants. The parties in the agreement specified that New York law would govern its interpretation. As pointed out in the Restatement, supra, § 187, the law chosen by the parties will be applied "unless either" (a) the chosen state "has no substantial relationship to the parties or the transaction" or (b) New York law was contrary to a fundamental policy" of Connecticut law, which law would be applicable under § 188, "in the absence of an effective choice of law by the parties." The underlying facts demonstrate that New York has a substantial relationship to the transaction since the agreement was prepared, discussed and executed in that state by a domiciliary thereof. The court recognizes that New York law may be more lenient than Connecticut law in determining the validity of a prenuptial agreement, but this difference does not appear to be contrary to this state's fundamental policies. Furthermore, although it is arguable that Connecticut has a greater interest in this matter than New York because the marriage took place in this state, and the decedent's estate is being processed pursuant to our laws, this state's interests are not "materially greater than those of New York. Moreover, § 188, referred to in § 187, in discussing the proper law governing contracts, includes references to the place of contracting and the place of negotiation of the contract. Although there was precious little negotiating, at least the contract was discussed in New York, and furthermore, was executed in that state by a New York domiciliary.
Assuming the laws of New York govern the enforceability of CT Page 1285 this prenuptial agreement, Sunshine v. Sunshine, supra, 381 N.Y.S.2d 262, states that: "[a] party seeking to attack the validity of the agreement has the burden of coming forward with the evidence showing fraud . . . in the absence of proof of facts from which concealment or imposition may reasonably be inferred, fraud will not be presumed . . . such a presumption must have as its basis evidence of overreaching — the concealment of facts, misrepresentation or some other form of deception." Even assuming Connecticut law applies, McHugh v. McHugh, supra,181 Conn. 489, states that as a general proposition "antenuptial agreements freely and fairly entered into will be honored and enforced by the courts as written." Other considerations applied under McHugh are: (1) whether the agreement accords with basic principles of contract law; (2) whether it violates any statute or public policy; (3) whether the circumstances of the parties changed drastically between the time the agreement was executed and the death of Mr. Elgar. Id., 490. The other major factor in evaluating the enforceability of a prenuptial agreement is whether there was full disclosure of the financial status of the parties. Id., 486.
It seems that, based on the foregoing criteria, this prenuptial agreement would be enforceable in this state, notwithstanding the referee's opinion to the contrary. Moreover, although the opinion in McHugh endorses the view that the parties to a prenuptial agreement n stand in a relationship of mutual confidence that calls for the exercise of good faith, candor and sincerity;" Id., 487; there is no indication that the burden of proof shifts to the proponent to establish the enforceability of the agreement, as urged by the plaintiff. Accordingly, the court concludes that the referee properly applied New York law. and that if Connecticut law were to be applied it would not affect the validity of the prenuptial agreement given the underlying facts found by the referee.
In conclusion, no material error in the referee's report has been found, nor any other sufficient reason why the report is unacceptable. Practice Book § 443. A judgment therefore enters in favor of the defendants in the first of the above captioned actions, and the appeal by the plaintiff is dismissed. Costs are to be taxed by the clerk. CT Page 1286