[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION UPON THE REPORT OF THE ATTORNEY TRIAL REFEREE
On July 29, 1988, the pond on plaintiff's property was chemically treated, at her request, by defendant professionals. Events occurring shortly thereafter included an extensive destruction of fish, amphibians and "water plants" which were found to have a total replacement value of $2,540.60. The issue central to this court's review is whether the subsequent pond-dredging plaintiff commissioned, at a cost exceeding $140,000, was necessitated, that is proximately caused, by defendants' conduct. The attorney trial referee awarded the smaller amount and essentially found unproven a causal connection to the more expensive endeavor, largely based upon her assessment of the expertise and credibility of opposing experts.
The matter was tried before the ATR presumably pursuant to C.G.S. § 52-434 et. seq. and Practice Book Section 430 et. seq., and was heard on 11 dates between September 21, 1993 and March 10, 1994. Ten different witnesses were heard and the transcript of the proceeding consumes 1,157 pages. Additionally, 108 exhibits were received and the briefs, proposed findings, and supplemental briefs (the latter requested by this Court), total 458 pages.
The attorney trial referee issued her "report" of 21 pages under date of June 29, 1994. (Subsequent to the report of the ATR, plaintiff filed a voluminous (77 page) motion to correct her report which the ATR rejected in her February 28, 1995 "response.")
Plaintiff's first count sounded in breach of contract and the CT Page 4572 ATR's report concluded that the defendants' failure to rid the pond of its weed and algae infestation entitled the plaintiff "to a restoration of the pond to the condition in which the defendants found it, at least". The report went on to state, in this regard: "As a result of the defendants' breach, the plaintiff has the right to be restored to her condition before the contract. This did not include the carnage in her pond, and the trier finds that the defendants have an obligation to replace (reasonably) the population of the pond." (ATR Report, dated June 29, 1994, at 5-6)
The second and third counts of the complaint sounded in negligence and reckless, wanton misconduct.
The ATR's report recommends defense verdicts on these two counts, having apparently determined that (as to Count One) although a breach of contract occurred, it was without negligence and, more importantly, from the damages standpoint, that plaintiff did not establish to the trier's satisfaction, sufficient causal connection between any conduct of the defendants and any necessity for the pond to be dredged.
Thus, from the Court's vantage point upon review, it may matter not whether there was negligence (Count Two) or "reckless and wanton misconduct" (Count Three) if it is so that the ATR should be upheld in finding unproven that defendants' conduct proximately caused the necessity of dredging.
The ATR's report contains several references to the testimony of experts. Her report identified Dr. Al Wiedow and Dr. Peter Rich as plaintiff's experts (and the file does reflect their having been disclosed by plaintiff). Said ATR report referred to expertise produced on defendants' behalf in the persons of defendant Dr. Richard Zavesky, (a licensed pesticide applicator), Dr. Richard Brown (whose disclosure was not found in the file but whose testimony revealed him to be an ecologist) and Paul Roland, a limnologist (as was plaintiff expert Rich).
It appears that the ATR rendered her recommendation for the defendant based primarily upon expert credibility determinations which were negative regarding that which plaintiff set forth and accepting as to the defense, especially Dr. Brown. The ATR in referring to defendants' expert, Dr. Richard Brown, pronounced herself "persuaded", noting his "impressive curriculum vitae which disclosed his learning specifically in the chemistry and reactions of ponds and waterways to [the] use and effects [of Diquat and CT Page 4573 Cutrine Plus]". (ATR Report, filed July 14, 1994, paragraph 35. p. 6)[1] In her next paragraph, the ATR paraphrased some of Dr. Brown's conclusions, pronouncing his evidence "credible testimony . . . which the trier adopts".
In a similar vein, ATR Coomaraswamy branded "unpersuasive" the expert testimony plaintiff produced (by Drs. Wiedow and Rich) stating she was "not aided" by it. (Id., paragraphs 33 and 34, p. 6) She again referred to "chemical background" as a factor in assigned weight of the experts: "Plaintiff's experts, toxicologist Dr. Wiedow, and Dr. Rich, University of Connecticut professor, whose field is Ecology, had no requisite chemical background to explain the fatal intervention of Diquat and Cutrine Plus." Presumably, this language was more realistically directed at Dr. Rich alone, in that Dr. Wiedow, with an undergraduate degree in marine science and a Ph.D. in Biochemical Toxicology from John Hopkins, would not seem aptly described as one without the "requisite chemical background".
The court has carefully studied the complete testimony of plaintiff's expert, Dr. Al Wiedow. This witness was utilized on September 21, 1993 (the first day of trial). His testimony began at pg. 120 and ends on pg. 175; however, in an unusual departure from evidentiary routine, this witness and Dr. Peter Rich, another plaintiff's expert, were utilized for a joint, shared, simultaneous presentation and, as a result, many of those 55 pages were devoted to Dr. Rich or to colloquy. Indeed, Dr. Wiedow's testimony consumes but 25 pages and no defense cross-examination was devoted to him.
The court is unable to glean any traditional "expert" opinion testimony from Dr. Wiedow on the sole issue in this review. That is to say, this expert for the plaintiff was never asked whether the chemical treatment of plaintiff's pond by defendants was a substantial factor in necessitating the dredging.
Moreover, close scrutiny of plaintiff's 180 page post-trial brief (dated May 5, 1994) reveals but scant reference to the topic of the necessity of dredging. (See pages 38-40, Pl.'s Trial Brief).
The ATR went on to deem the Wiedow testimony "unpersuasive" rather than merely inadequate or vague, and might be properly upheld on the basis that Wiedow's testimony did not clearly or pointedly advance plaintiff's cause. CT Page 4574
That is to say, if one views the plaintiff's post-trial portrayal of Wiedow's testimony found on pp 38-40 of plaintiff's 180-page May 5, 1994 trial brief, one sees the ready potential for rejection by a trier of fact.
 e. The copper in the Cutrine Plus would be absorbed into the sediment of the pond (TR-C-29, 30).
 f. The copper absorbed in the sediment of the pond would move back and forth between the sediment and the pore water, which is the water in the top of the sediment and just above it (TR-C-49-52).[2]
 g. The amount of copper in the pore water would affect the Benthic Population and could be taken in by said population in toxic amounts (TR-G-19-22, 49-52) (TR-A-147).
 h. Under certain conditions, a redox change in the copper in the sediment of Plaintiff's pond could take place giving rise to another toxic event harmful to fish and other aquatic creatures (TR-H-19, 20, 21, 22). Dr. Wiedow testified with respect to a paper entitled "Predicting Acute Toxicity of Copper in Fresh Water Sediments: Evaluation of the Role of Acid Volatile Sulfide", Journal of Environmental Toxicology and Chemistry (the Ankley Study) (PL EX-76). With respect to the toxicity of copper to Hyallate Azteca Dr. Wiedow said that ". . . the indication behind that is that the copper is available, even with an AVS binding, to increase toxicity to the animal . . ." In a pond such as Mrs. Nordmann's ". . . the pH would definitely have a pronounced effect on it, keeping the sulfide, or the copper, ib. solution. The alkalinity also has an effect because there is very little of the bicarbonate in the water to bind the copper, so the alkalinity and pH will actually drive the availability of the copper into solution."[3]
 i. In order to avoid the potential of such a toxic event, the contaminated material would have to be removed prior to re-establishment of Plaintiff's pond. (TR-A-172)[4]
 j. Diquat would not be affected by the redox potential and it would remain bound to the sediment. (TR-A-170-171)
 k. Acute toxicity is a standard of measuring how much of a chemical will kill a fish or other aquatic organisms at the CT Page 4575 time of application. Acute toxicity tables are derived from measurements taken in a laboratory under controlled conditions (TR-A-124-126, PL EX 43).
 l. His conclusions as to acute toxicity on July 29, 1988 resulting from Defendants' application of chemicals into the pond are the same based on either Plaintiff's volumetric calculation (TR-H-2, 3) (TR-A-91-92; PL EX 36) or Defendants' calculation. (TR-H-2, 3 DEF EX 63). Defendants' calculations, done during the trial period, were based on Plaintiff's survey or the pond and profile data taken with the full water level on June 15, 1990 (PL EX 1, 36, 37 and 70; DEF EX 63).
 m. The volumetric calculation of the copper in the pond water in the acute stage has no effect on the calculation of the copper in the sediment (TR-H-2, 3).
 n. It is possible that the grass carp that died in Plaintiff's pond in 1990 died from copper poisoning as a result of eating plants containing copper (TR-H-5-9).
The trier of fact must be upheld with regard to her conclusion (which must be accorded great weight in the matters of the credibility of expert opinion) that the Wiedow testimony was "unpersuasive" as to whether these defendants necessitated the pond's being dredged.[5]
This may be illustrated by the fact that the most salient of these plaintiff-composed testimonial paraphrasings is (i) ["[I]n order to avoid the potential of such a toxic event, the contaminated material would have to be removed prior to re-establishment of plaintiff's pond."]
The citation reveals the raw testimony to be more tentative by a good deal.
 Q. If it's in a pond, not a moving body of water, would it be your opinion that the way to avoid any further acute episodes and to avoid chronic would be to remove the copper from the pond?
 A. That would be one way to eradicate the copper toxicity, yes. To prevent exposure as a key to toxicity, its hazard. If you remove the source of the hazard you CT Page 4576 decrease the toxicity. If you can make the copper biounavailable that would decrease the toxicity. Since there are really no mechanisms to do that in aquatic systems, there are yunes (phonetic), chelation therapy, removal of those sediments would probably be one of the better recourses to do.
 Q. Would you recommend that to someone who has a pond which has the overdose of copper in it?
 A. Given options I would say that was probably a plausible option to do.
 Q. Particularly where the pond is part of the house and the property?
 A. Yes. But that's not in my area of expertise to make that decision.
Hence, the court must uphold the ATR's determination as to the negative weight accorded Dr. Wiedow's profferings.
There remains now to review the ATR's negative credibility determination as to plaintiff's other expert, Dr. Peter Rich. Dr. Rich was, in the main, opposed by defense expert Dr. Richard Brown. Such a determination as was made below might be upheld with either adequate support in the record for remaining unpersuaded by Dr. Rich or, conversely, for favoring Dr. Brown. Each strength in the expert for the side prevailing below constitutes and exaggerates a weakening in the side failing below.
The testimony of plaintiff's Dr. Rich appears to have suffered (as to any conclusion that dredging was necessitated by the overdose) in several regards.
There was no solid documentation of, or citation to, other occurrences, experimental or natural, consistent with the notion that copper in the sediment would ascend into or re-enter the water column and cause destruction anew of life between the surface and the bottom. (See, e.g. Rich testimony, September 23, 1993, pp. 55-57).
Further, the lone study to which Dr. Rich pointed for support outside the laboratory was published in the 1930's, and, as best this court can determine from the testimony, either contains CT Page 4577 distinctions from the incident at bar or is merely anecdotal due to an apparent absence of follow-up.
Another aspect of difficulty plaintiff suffered, aside from the head-to-head battle of the experts, concerned whether any need to dredge, if there was one, would not have been present subsequent to an application at said time with a proper dosage. The pond in question had been treated several times in the past, virtually annually, with similar, albeit less material. It appears that the evidence may not have permitted the sorting out of accumulated prior copper residue, and its effects, from that contributed by these defendants. Put more simply, there may have existed the possibility that a proper application by defendants may have contributed that last quantum of chemical additive to the pond bottom so as to render dredging necessary in any event.[6]
A reading of the entire testimony of defendants' expert, Dr. Brown, whom the ATR pronounced credible, reveals an undermining of the notion of dredging being necessary. This witness describes the process by which the chemical becomes bound in the sediment and unavailable for re-entry into the water above, thus diminishing the likelihood of visiting further harm upon newly-introduced fish stocks. See, e.g. pgs 91-96, testimony of Dr. Richard Brown, October 1, 1993.
When this "credible" attack is set against the somewhat unsupported or "tentative" proposition(s) of plaintiff one has no alternative but to find the ATR's determination abundantly supported.
The ATR articulated an erroneous burden of proof for negligence in her report: "[The weightier standard of proof applies to a tortious act — clear and convincing. Under the theory of contracts, the standard required is merely fair preponderance . . . ." ATR Report, p. 21.
The court believes that a reading of the 21-page report fairly suggests that the ATR was inadvertently referring to the fact that more elements were needed to prove negligence than breach of contract; that the negligence path was here more strewn with obstacles.
This court has treated this written misstep as harmless error in that the body of the report evidences the trier's conclusions throughout that the causation as to dredging was not shown. CT Page 4578 Further, the evidence reveals a failure by plaintiff to proffer or show, by any standard, what the standard of care was, whether it was violated, how it was violated, whether harm beyond the death of the fish and water plants occurred, whether the bottom was harmed, whether any such harm to the bottom would return to cause new harm, and whether dredging was necessary or curative. One could not study the ATR report and conclude that a different result was possible even if "the standard is preponderance" was engraved on each page.
No ATR factual finding required correction for appropriate consideration of the issues under contest and no legal determination, which is this court's responsibility, in the end, is required to be differently made than the ATR recommended. See SealAudio, Inc. v. Bozak, Inc., 199 Conn. 496 (1986); Practice Book Section 443; and Dills v. Enfield, 210 Conn. 705 (1989).
The report of the ATR is accepted and judgment for plaintiff in the amount of $2,540.60 is hereby entered as to Count One. As to Counts Two and Three, the report of the ATR is accepted and judgment entered for the defendants.
NADEAU, J.