[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case involves a dispute between the plaintiff, Frank Nicotera, and the defendants, Wethersfield Oil, Inc. and John Purtill, concerning their March 3, 1990 modified agreement ("agreement") for the purchase and sale of a parcel of land located at 1912 Berlin Turnpike in Wethersfield, Connecticut. In his six-count Revised Complaint ("Complaint") dated February 26, 1991, the plaintiff claims, inter alia, that Wethersfield Oil breached the agreement by failing to deliver the property to him in "acceptable environmental condition." Complaint, Count I, ¶ 9.
On or about September 10, 1993, the case went to trial before Attorney State Trial Referee Dennis G. Ciccarillo. After receiving evidence on divers dates over the next eight months, the referee rendered his final Report and Memorandum of Decision ("Report") on August 15, 1994.
In his Report, the referee made forty-four (44) separate findings of fact and wrote a ten-page conclusion of law. On the basis of his findings and conclusion, the referee recommended:
 (a) judgment for the Plaintiff on the Defendants' counterclaims; (b) judgment for the Defendants on Counts 2, 3, 4, 5 and 6 of the Revised Complaint; and (c) judgment for the Plaintiff, on the First Count [of the Complaint], against the Defendant Wethersfield Oil, Inc., in the amount of $5,000.00.
Report, 17.
Wethersfield Oil has objected to the acceptance of the referee's Report, in and to the extent that it recommends judgment for the plaintiff on the First Count of his Complaint. Neither party has objected to the balance of the referee's Report.
In its Objection, which was duly filed under Section 440 of the Connecticut Practice Book, the defendant claims, in substance, that the Report must be rejected because the factual findings of the referee do not establish a breach of contract under the only theory pleaded in the Count on which judgment is recommended. Indeed, claims the defendant, the CT Page 6666 facts found by the referee so clearly demonstrate that the plaintiff did not prove his case on the First Count of his Complaint, that the defendant is entitled to the entry of a judgment of dismissal on that Court under Section 302 of the Connecticut Practice Book.
 I
"Proceedings before attorney trial referees are governed by procedures set forth in Practice Book §§ 434 through 444. The rules of practice provide specific procedures to be followed by a party who disputes the ultimate findings and rulings of the referee including rulings upon the evidence."Blessings Corp. v. Carolton Chronic Convalescent Hospital,Inc., 7 Conn. App. 364, 366, 508 A.2d 829 (1986). "The attorney trial referee sits only as a fact finder." NationalElevator Industry Pension, Welfare Educational Funds v.Scrivani, 31 Conn. App. 728, 733, 626 A.2d 1322 (1993). "[T]he trial court has the power to render whatever judgment appropriately follows, as a matter of law, from the facts found by the attorney trial referee." Dills v. Enfield,210 Conn. 705, 713, 557 A.2d 517 (1989).
"Within two weeks after the [attorney trial referee] files his report, either party may move to correct the attorney trial referee's findings of fact. Practice Book § 438. If the [attorney trial referee] fails to correct a report as requested, the moving party may file exceptions seeking correction of the report by the court within ten days after the decision on the motion to correct has been filed. . . . Within two weeks of the filing of the [attorney trial referee's] decision on the motion to correct, an objection to the acceptance of the [attorney trial referee's] report maybe filed. Practice Book 441." (Citations omitted; internal quotation marks omitted.) Ramos v. McQueen, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 2450898 (January 12, 1995, Ford, J.).
An objection is addressed to the referee's legal conclusions, while an exception challenges its findings of fact. Martino v. GM Excavating, Inc., Superior Court, judicial district of Ansonia-Milford, Docket No. 034924 (February 3, 1993, Jones, J.). The trial court does not have authority to retry the case, and may "not find additional facts or reject others `unless a material fact has been found CT Page 6667 without evidence or the [referee] has failed to find an admitted or undisputed fact, or has found a fact in such doubtful language that its meaning does not appear.'" Dillsv. Enfield, supra, supra at 714, quoting Practice Book § 439.
"The trial court's task is to determine whether the conclusions of fact and law by the referee `are legally and logically correct and whether they find support in the facts found by the referee.'" Southern Connecticut Gas Co. v.Parktown Assocs., Superior Court, judicial district of Fairfield, Docket No. 274334 (January 9, 1995, Levin, J.), quoting Practice Book § 440. Upon making this determination,
 The Court shall render such judgment as the law requires upon the facts in the report as it may be corrected. If the court finds that the committee has materially erred in his rulings or that by reason of material corrections in his findings the basis of the report is subverted or that there are other sufficient reasons why the report should not be accepted, the court shall reject the report and refer the matter to the same or another committee for a new trial or revoke the reference and leave the case to be disposed of in court.
 The court may correct a report at any time before judgment upon the written stipulation of the parties or it may upon its own motion add a fact which is admitted or undisputed or strike out a fact improperly found.
Practice Book § 443.
 II A fundamental tenet in our law is that the plaintiff's complaint defines the dimensions of the issues to be litigated. "[T]he right of a plaintiff to recover is limited to the allegations of [her] complaint. . . ." (Citations omitted; CT Page 6668 internal quotation marks omitted.) Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 535, 537, 546 A.2d 216 (1988); Vinchiarello v. Kathuria, 18 Conn. App. 377, 383, 558 A.2d 262 (1989). "The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . A plaintiff may not allege one cause of action and recover upon another. Facts found but not averred cannot be made the basis for a recovery. . . . (Citations omitted; internal quotation marks omitted.)" Mitchell v. Mitchell, 31 Conn. App. 331, 334, A.2d (1993). "A judgment in the absence of written pleadings defining the issues would not merely be erroneous, it would be void." Telesco v. Telesco, 187 Conn. 715, 720, 447 A.2d 752 (1982); Vinchiarello v. Kathuria, supra, 384; Tehrani v. Century Medical Center, 7 Conn. App. 301, 308, 508 A.2d 814 (1986).
Pergament v. Green, 32 Conn. App. 644, 650 (1993).
 III
In the First Count of his Complaint, the plaintiff alleges the following facts:
 1. The plaintiff is an individual resident of Wallingford, Connecticut.
 2. The defendant, Wethersfield Oil, Inc., is a Connecticut corporation with a principal place of business in Wethersfield, Connecticut.
 3. By written agreement dated November 24, 1989, a copy of which is attached [to the Complaint as] Exhibit A, the defendant, Wethersfield Oil, Inc., agreed to sell, and the plaintiff agreed to buy, a certain parcel of property located at CT Page 6669 1912 Berlin Turnpike, Wethersfield, Connecticut.
 4. By written agreement dated March 3, 1990, a copy of which is attached [to the Complaint as] Exhibit B, said parties modified their agreement to provide that the plaintiff would remove certain tanks from the property.
 5. At the time said parties entered into their agreement, the only tanks known to them were three gasoline tanks buried on the property.
 6. Further excavation revealed that an oil storage tank and a fuel oil tank, whose existence was hitherto unknown to said parties were buried on the property.
 7. By correspondence dated August 6, 1990, the plaintiff exercised its option, contained in Schedule A to the contract (Exhibit A) dated November 30, 1989, to withdrawal from the contract.
 8. The plaintiff has incurred expenses for cleaning up the property and has paid the sum of $5,000.00 to the defendant, Wethersfield Oil, Inc., as a deposit and despite demand, by correspondence dated May 16, 1990, reimbursement of those amounts has not been made.
 9. The defendant, Wethersfield Oil, Inc., has breached its contract with the plaintiff in that it failed to deliver the property to the plaintiff in acceptable environmental condition.
Revised Complaint, Count I. Having never sought to amend his Complaint to state new or different theories of breach of contract, the plaintiff cannot prevail on the First Count of his Complaint unless the facts found by the referee prove that he is entitled to recover on one of the specific theories of CT Page 6670 recovery set forth therein.
In stating his conclusion that the plaintiff is entitled to the return of his $5000.00 deposit under the First Count of his Complaint, the referee described the claims therein presented as follows:
 The Buyer's First Count alleges pieces of various legal theories including mutual mistake, and or option exercised the Buyer, to withdraw from the contract. . . . The remaining substantive allegation, not dependent upon these stray points, is that the Seller breached by failing "to deliver the property to the plaintiff in acceptable environmental condition."
He then discussed and dismissed each such legal theory as a basis for awarding the requested relief.
As for the plaintiff's theory of mutual mistake, which is also alleged in the Fourth Count of the Complaint, the referee ruled that it is not a proper basis for relief because any "mistake" made by the parties as to the number of underground tanks on the property, "even if mutual, clearly was not material to these parties." Report, pp. 12-13. This conclusion is amply supported by the referee's factual findings, to wit:
 17. At the time of the unearthing of the gasoline tanks, two further tanks — one for heating oil and one for waste oil — were discovered but were not removed.
 18. The parties did not discuss the removal of the two extra tanks.
 19. While the extra two tanks eventually became part of the controversy, as the parties were jousting for legal position, the parties originally did not consider their discovery to be problematic.
Report, p. 4. In light of these findings, the referee correctly rejected the plaintiff's claim that he is entitled CT Page 6671 to the rescission of the subject contract and to the return of his $5,000.00 deposit on the ground of mutual mistake.
The plaintiff's second claim of entitlement to the return of his $5,000.00 deposit is that he lawfully exercised his option to withdraw from the contract under the terms of the contract itself. The referee flatly rejected this claim, concluding that "the Buyer held no options after the modification of March 3, 1990."
This conclusion is also well supported by the referee's following findings of fact:
 1. On or about November 30, 1989, Frank Nicotera ("Plaintiff or "Buyer") and John Purtill, Jr. and Wethersfield Oil, Inc. ("Defendants" or "Purtill" or "Seller") entered a written Agreement (the "Agreement") by which Nicotera agreed to purchase and Purtill agreed to sell a certain parcel of land known as 1912 Berlin Turnpike, Wethersfield, Connecticut (the "property") formerly operated as a gasoline station for a purchase price of $300,000.00, with a closing date of March 1, 1990.
 2. A deposit of $5,000.00 was made by Nicotera to Purtill.
 3. The Agreement called for an additional deposit by "5 days after acceptable environmental report."
* * *
 5. According to the Agreement, Buyer was to obtain an environmental report, for "approximately $2,000.00," and, in the event the report showed "contamination," Buyer could withdraw and receive back his $5,000.00 deposit.
 6. Buyer engaged a firm to do an "environmental study." The results of a CT Page 6672 water test were inconclusive, and the parties determined that three gasoline tanks would be dug up and removed, and that soil would be tested.
 7. Thereafter, the parties, both directly with each other and through their attorneys, re-negotiated the agreement, culminating in a "Modification of Purchase Agreement" ("Modification") dated March 3, 1990.
 8. The parties waived the March 1, 1990 closing date specified in the Agreement.
 9. The Modification amended the Agreement to specify that only "Wethersfield Oil, Inc." was the Seller, that Purtill was a limited guarantor, and to specify the allocation of expenses and the contingencies regarding the removal of the tanks and any associated clean-up costs.
 10. More specifically, the Modification required the following:
 a. removal of the tanks by the Buyer, at his expense;
 b. engagement of an environmental consultant by the Buyer, at his expense, to determine the extent of hazardous waste contamination and the cost of clean-up;
 c. upon a cost estimate for clean-up of $20,000.00 or less, Buyer was to absorb such costs and close within three weeks;
 d. upon a cost estimate exceeding $20,000.00, Seller was to have the option to: CT Page 6673
 i. withdraw from the Agreement and pay Buyer his deposit plus costs associated with removing the tanks; or
 ii. perform the Agreement, with the Buyer placing $20,000.00 in escrow with Seller's attorney to pay for clean-up, and Seller was to accomplish such clean-up. Any escrow balance was to be returned to the Buyer, and, if the costs exceeded $20,000.00, such excess was to be paid to the Seller, guaranteed by John Purtill, Jr. Seller had the further option, upon the costs actually exceeding $20,000.00, to declare the Agreement void and then to return both the $5,000.00 deposit and the $20,000.00 escrow, with interest, to the Buyer.
 11. The Buyer further acknowledged that he would have the opportunity to inspect the property after completion of the clean-up and that he would be purchasing the property "as is."
 12. No new closing date was set within the Modification. Time was not of the essence of the contract.
* * *
Report, pp. 1-4. These findings make it clear that under the terms of the parties' modified agreement, which was effective as of the date of its adoption, the Buyer, plaintiff Nicotera, had no contractual option to withdraw therefrom. His preexisting option to with draw if an initial environmental report showed "contamination" was plainly superseded by the modification, for not only did it provide that a specific CT Page 6674 course of action would be taken to clean up existing contamination, but it agreed that after the clean-up was completed, he would accept the property "as is." These findings are entirely consistent with the referee's conclusion that in the wake of the adoption of the modification, he no longer had the simple option to walk away.
The third and final theory of recovery set forth in the First Count of the plaintiff's Complaint is that the defendant breached the parties' contract by failing to deliver the subject property in "acceptable environmental condition." As to this theory of recovery, the referee stated the following conclusions:
 The Seller defended against this [theory] by raising questions of the meaning of the phrase "acceptable environmental condition" and the lack of proof on this point. The Seller further contended, in a brief, that "after the work that was performed by the Defendants was completed, the property was in an `acceptable environmental condition.'" Putting aside the "environmental" questions, the simplest question is whether the Seller delivered the property in accordance with the contract. In short, it did not. The Defendants did not complete the clean-up, so there is no need to fret over exactly what condition would or would not have resulted from that clean-up. That the Buyer alleged a more detailed breach than he had to allege does not defeat his essential claim of Seller's failure to deliver under the contract. The allegation sufficiently apprised the Seller of the issues, notwithstanding the distracting allusions to "acceptable environmental condition."
Report, p. 13 (Emphasis added).
By so stating his relevant conclusions, the referee made it clear that he did not base his finding of breach of CT Page 6675 contract on the only breach-of-contract theory set forth in the First Count of the Complaint. Dismissing the plaintiff's own description of his claim as a "distracting allusion," the referee contented himself with finding that the contract had been breached in another way — to wit, by failing to complete the clean-up called for under the contract — and on that basis declined to "fret" about the environmental acceptability of the property's condition at the time of the alleged breach.
By taking the above-described course, the referee improperly departed from his only lawful mission in this case, which was to decide the claims before him as the parties presented them. By ignoring the plaintiff's claim of breach of contract and deciding a different claim which the parties did not fully and fairly litigate, the referee reached conclusions of law which he was not empowered to make and made a recommendation as to the entry of judgment which this Court cannot accept. The Court must therefore reject that portion of the referee's report which recommends judgment for the plaintiff on the First Count and refer the matter once more to the referee for further proceedings consistent with this opinion.
On the re-referral of this case, the referee is hereby directed to make the following necessary inquiries: First, does the parties' agreement, as modified on March 3, 1990, require that the defendant deliver the property to the plaintiff in "acceptable environment condition?" The referee's Report does not find whether or not such a requirement was imposed by the modified agreement. If there was no such requirement, the referee will have no choice but to find that the defendant could not have breached the contract by failing to meet it.
If, by contrast, the referee finds that the parties' modified agreement does contain such a requirement, the second question to be answered is, "What is the meaning of that requirement?" In his initial Report, the referee expressly declined to make such a finding, stating:
 Much argument occurred over a duty to deliver the property in an "acceptable environmental condition." The Buyer alleges that this was the Seller's duty. CT Page 6676 The original Agreement refers to an additional deposit "after acceptable environmental report" and contemplates that a report may show "contamination." The parties negotiated a detailed modification to deal with "hazardous waste contamination" by "clean-up." There was little proof on the point of contamination," and there was no proof on what was meant by "acceptable environmental report." However, it is not necessary to decide exactly what was meant by these terms, or whether there was or was not "contamination," for the Seller opted to clean up the property.
The necessity of clean-up was assumed at the time, and it has not been denied since then. That clean-up was not performed. The Buyer was to have had the opportunity to inspect the property after completion of the clean-up. That opportunity did not exist; the property was not cleaned up until two years later.
Report, p. 11. (Emphasis added).
Unfortunately, such observations do not answer the question here at issue. If the term, "acceptable environmental condition," as used to describe a contractual requirement imposed on the defendant, means "cleaned up in accordance with the parties' modified agreement," then the referee could easily have said so. To date, however, he has not. This, of course, leaves open the alternative possibility that the term establishes some external, subjective or objective standard of environmental acceptability. If it does, then whether or not the contemplated clean-up was actually completed by the time of the alleged breach would not necessarily have mattered. Simply stated, the partial completion of the clean-up, though perhaps less than what the parties agreed to in their March 3, 1990 modified agreement, may yet have put the property in an "acceptable environmental condition," thereby satisfying the only requirement here claimed to have been violated.
The third and final question to be answered, if the term CT Page 6677 "acceptable environmental condition" does not mean "cleaned up in accordance with the parties' modified agreement," is as follows: "Was the subject property in fact in `acceptable environmental condition' at the time of the defendant's alleged breach?" If the plaintiff fails to prove that it was not, the defendant is entitled to a judgment in its favor on the First Count of the Complaint.
CONCLUSION
In conclusion, the referee, on re-referral, must decide whether or not the defendant breached its contract with the plaintiff in the specific manner alleged in the First Count of the Complaint. If the evidence presented does not support such a finding, the referee may not recommend judgment for the plaintiff on some other, unpleaded theory of breach of contract.
As for all other counts of the plaintiff's complaint and all counts of the defendants' counterclaims, judgment as recommended by the referee may enter forthwith, since neither party objected to the referee's pertinent findings, conclusions and recommendations with respect thereto. Practice Book § 441.
Michael R. Sheldon, J.