[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case comes to this court as the result of a hearing in damages trial. The briefs were filed simultaneously on August 29, 1997.
Teachers Insurance and Annuity Association of America (hereinafter called "Teachers") commenced this action in 1993 to foreclose a mortgage (see the mortgage Exhibit #3) securing a Twenty-seven Million Dollar loan from Teachers to the defendant CT Page 14019 Broad and Hanranhan Limited Partnership (hereinafter called ("Broad") evidenced by a promissory note (Exhibit #2 the note). The mortgage property is the office building known as 9 West Broad street, Stamford (hereinafter called the "Property"). Summary judgment was entered in favor of Teachers as to Broad's liability in June of 1995. This court tried the remaining issues as to the amount of the mortgage, the type of judgment and the issues raised by Broad's remaining special defenses. Trial was held by this court and simultaneous briefs were filed on August 29, 1997.
The court finds that Teachers has established that it is entitled to a judgment of strict foreclosure. Teachers has established the mortgage debt owed by Broad and that the property is worth far less than the debt. The court finds in favor of the plaintiff as to Broad's special defenses both on the law and on the facts established at trial.
This court finds the following facts to have been proven.
1. Broad and Hanrahan Limited Partnership ("BHLP") signed a Note, Mortgage, and Assignment of Leases with Teachers Insurance and Annuity Association of America ("TIAA") on December 30, 1985. The Note and Mortgage were in the original principal amount of $27 million. (EX. 2, EX. 3, EX. 4; T. 7/30/97 at pp. 27-30).
2. The security for the loan was the Mortgage on the Property located at 9 West Broad street, Stamford, Connecticut, as well as the rentals on said Property. (EX. 3, EX. 4).
3. The Loan Documents were non-recourse as to both BHLP and the partners of BHLP. (Ex. 3; T. 7/30/97 at pp. 31-32).
4. There was no other obligor other than BHLP and, in accordance with both the Note and the Mortgage, TIAA could look only to the property for the satisfaction of the debt. (EX. 2; Ex. 3; T. 7/30/97 at pp. 32, 88-89).
5. The property had been assembled, acquired, designed, built, operated and managed by BHLP. (T. 7/31/97 at pp. 195-196).
6. The property was and is a $182,000 rentable square feet "A" class office building in a desirable business zone/location in the city of Stamford. (EX. 10; T. 7/30/97 at p. 71; T. 7/31/97 at pp. 11-12, 54, 178; T. 8/1/97 at p. 1). CT Page 14020
7 At the time the Loan Documents were signed, the Property was almost completely leased and was considered to be "investment grade." Ex. 4; T. 7/30/97 at p. 66, 70-71; T. 7/31/97 at pp. 68, 196).
8. The major tenant at the time the Loan Documents were signed was Savin Corp. which leased 44% of the building pursuant to a lease dated May 4, 1983. (Ex. 4; T. 7/30/97 at p. 66; T. 7/31/97 at p. 197).
9. Savin's lease, which was at the then prevailing market, was for a 10 year term with a base rent at the time of approximately twenty seven dollars ($27.00) per square foot. The original Savin lease was a triple net lease. (T. 7/31/97 at p. 198).
10. A condition precedent to TIAA's agreement to provide the loan to BHLP was an Assignment of Lessor's Interest in Leases. (Ex. 4; T. 7/30/97 at pp. 29-30, 35).
11. At the time the Loan Documents were signed, TIAA approved the Savin lease. (T. 7/30/97 at p. 66).
12. At the time the Loan Documents were signed, TIAA deemed Savin to ba a creditworthy tenant (T. 7/30/97 at p. 67).
13. Savin defaulted on the original lease in July 1992. (Ex. 14; T. 7/30/97 at p. 68, 69).
14. Savin declared bankruptcy on or about August 25, 1992 and thereafter terminated its lease. (T. 7/30/97 at p. 68; T. 7/31/97 at p. 198).
15. Prior to the bankruptcy, BHLP had advised TIAA of the problems being experienced with respect to the Savin rent payment obligations and the fact that the cash flow would decrease to a level below what was needed to service the loan. (Ex. 5; T. 7/30/97 at pp. 69-70; T. 7/31/97 at pp. 175-176).
16. BHLP remained current in the required payments on the Note and Mortgage until January 1993. (Ex. 5; T. 7/30/97 at pp. 36-37).
17. As a result of Savin's bankruptcy, BHLP received a CT Page 14021 substantially reduced rental payment from July 1992 until Savin vacated the remaining space it leased in the Property. (EX. C; T. 7/30/97 at p. 85-86; T. 7/31/97 at pp. 175-176, 198-199).
18. Independent of the Savin bankruptcy, between December 1985 and January 1993, the commercial real estate market in Stamford, the commercial real estate market in Connecticut and in the Northeast in general experienced a substantial economic downturn. (T. 7/30/97 at p. 76; T. 7/31/97 at pp. 81-82; T. 8/1/97 at pp. 8-10, 31-33).
19. Between the signing of the Loan Documents in late 1985 and the default on payments in early 1993, the value of the Property decreased by approximately sixty seven percent (67%) from approximately thirty-six million dollars ($36,000,000.00) to twelve million dollars ($12,000,000.00). (T. 7/30/97 at pp. 78-83; T. 8/1/97 at p. 11).
20. The Loan Documents were drafted by TIAA and their lawyers. (T. 7/30/97 at p. 86).
21. BHLP continued to make the required mortgage payments on the Property for six months after Savin defaulted on its original lease. (EX. 5; T. 7/30/97 at pp. 66-70).
22. After the Savin Bankruptcy, BHLP and TIAA cooperated one with the other to maximize the rental income from the property including increasing the square footage leased by Nine West Group, Inc. ("Nine West"). (T. 7/31/97 at pp. 199-201).
23. When the majority of the Property was leased to Nine West in 1993 after the Savin bankruptcy and after Savin vacated the remaining space they held in the building, the rental was sixteen dollars and fifty cents ($16.50) per square foot, a decrease in base rent of more than ten dollars ($10.00) per square foot from the amount paid by Savin and a decrease in the base rent of more than twelve dollars ($12.00) per square foot from the rate Nine West had been paying up to that time. (T. 7/31/97 at pp. 198-201).
24. TIAA accelerated the loan in March 1993. (T. 7/30/97 at p. 39)
25. Prior to the filing of a motion for the appointment of a Receiver of Rents, TIAA took affirmative actions to become a mortgagee in possession by notifying tenants that rents should be CT Page 14022 sent directly to TIAA. (EX. 15; T. 7/30/97 at pp. 39-40, 89-90; T. 7/31/97 at pp. 164-167).
26. Prior to placing a Receiver into the property, the property was being managed by Cushman Wakefield. The Receiver sought by TIAA was Cushman Wakefield. The appointment of the Receiver did not change the management style and/or operations. (T. 7/30/97 at p. 71; T. 7/31/97 at pp. 135-137).
27. Paragraph 40 of the Mortgage, as drafted by TIAA's lawyers, reads as follows:
 40. That notwithstanding any provision herein or in the Note secured hereby Mortgagee agrees with Mortgagor that in the event Mortgagee shall at any time take action to enforce the collection of the indebtedness evidenced by the Note, or any other monetary claim under the Note or this Mortgage Deed or any other loan document securing the Note now or hereafter executed and delivered by Mortgagor, it shall proceed to foreclose this Mortgage Deed instead of instituting suit upon the Note or this Mortgage Deed to enforce such a collection and if as a result of such foreclosure and sale of the mortgaged premises, a lesser sum is realized therefrom than the amount then due and owing hereunder and under the Note, Mortgagee will never institute any action, suit, claim or demand in law or in equity against Mortgagor or any partner or partners thereof for or on account of such deficiency or other money judgment, provided, however, that nothing in this paragraph contained shall in any way affect or impair the lien of this Mortgage Deed, the ability of the Mortgagee to foreclose or to exercise any remedy other than one seeking such a deficiency. Notwithstanding the foregoing provisions of the Paragraph, the limitation of liability set forth herein shall not apply to the extent Mortgagor applies rents, income or profits from the mortgaged premises in violation of the covenants set forth in Paragraph 3 of the Assignment of Lessor's Interest in Lease(s) securing the Note, but only to the extent of sums misapplied. (Emphasis Added) (Ex. 3)
28. The property had, since its construction and while being operated by BHLP's general partner's management company, then by Cushman and Wakefield as independent managers, then by Cushman CT Page 14023 and Wakefield as Receiver and then by Rand Associates as Receiver, always been professionally managed and maintained. (T. 7/30/97 at pp. 71-72; T. 7/31/97 at p. 176).
29. After BHLP had carried the Property for six months, BHLP proposed establishing a cash flow mortgage with TIAA. (EX. 5; T. 7/30/97 at p. 37).
30. TIAA has a policy not to negotiate cash flow mortgages. (T. 7/30/97 at pp. 63-65; T. 7/31/97 at pp. 178-181).
31. TIAA commissioned a report on the Property by Merritt 
Harris in April, 1993 which indicated that numerous repairs were necessary. (EX. B; T. 7/30/97 at pp. 93-94; T. 7/31/97 at pp. 168-175).
32. Over the course of the last four years, TIAA's appraiser has appraised the subject Property and ascribed the following values to the property as of the following dates:
July 1, 1993 $12,000,000.00 (EX. 14)
March 10, 1995 $14,000,000.00 (Ex. 13)
March 21, 1996 $13,300,000.00 (EX. 12)
January 8, 1997 $14,600,000.00 (Ex. 10; Ex. 11)
33. The value of this property is anticipated to increase over the course of the next four to five years at which time the value is projected to stabilize. (T. 7/30/97 at p. 85; T. 7/31/97 at pp. 29-30).
34. Nine West is the primary tenant in the building and has announced plans to vacate the building. It is their vacating the building that causes the necessity of a complete retenanting of the building. (T. 7/30/97 at pp. 103-105; T. 7/31/97 at pp. 96-102).
35. The brokerage commissions to be incurred in the retenanting of the building are estimated to be approximately two million four hundred fifty thousand dollars ($2,450,000.00) and the Tenant Improvements to be expended for the retenanting of the building are estimated to be in the range of four million five hundred thousand dollars ($4,500,000.00) to five million dollars ($5,000,000.00). (T. 7/30/97 at pp. 105-108; T. 7/31/97 at pp. CT Page 14024 96-102, 108-109).
36. TIAA's appraiser has estimated the value of the Property to be $14.6 million dollars as of January 8, 1997 which is a value higher than he ascribed prior to Nine West announcing it was vacating the building. (EX. 14; T. 7/31/97 at p. 5).
37. Arthur Collins is one of the general partners in BHLP. Mr. Collins is a graduate architect who has been in the real estate development field for approximately forty years. Mr. Collins has acquired, developed, built, managed and/or sold numerous commercial properties in Fairfield County in addition to residential condominiums and apartment projects and dockominiums. (T. 7/31/97 at pp. 185-189).
38. Mr. Collins is familiar with real estate values in Fairfield County generally and in Stamford specifically. Mr. Collins testified that, in its present condition and factoring in the capital requirements of upgrading and leasing the property, the property is worth approximately eleven million dollars ($11,000,000.00). (T. 7/31/97 at pp. 215, 219-222; T. 8/1/97 at Pp. 1-2).
39. An aggregate value of eleven million dollars ($11,000,000.00) would be approximately sixty dollars ($60.00) per square foot [$11,000,000.00 divided by 182,000 square feet.], which is within the range of other Class A office buildings in the Stamford CBD which were sold during the relevant time period. (T. 7/31/97 at pp. 112-120, 151-152).
40. The court finds the debt as of July 30, 1997 $39,757,539.12 with per diem interest at $9,715.86 from that date less an additional payment by the receiver of rents to Teachers since the date of trial to be $214,824.08.
41. The court finds that the appraisal done by Mr. Barenholtz, as reflected in Exhibit 10, the value of the property as of January 8, 1997 was $14,600,000.00 and at the time of the trial, the value had not changed significantly. The trial concluded on August 1, 1997.
42. The court finds there is no equity in the property. Where the mortgage debt exceeds the value of the foreclosure property, the foreclosing plaintiff is entitled to a judgment of strict foreclosure. Where courts find there is no equity by, comparing CT Page 14025 the amount of the mortgage debt and the value of the property only, the no equity finding is required and the court is not required to determine the property's value, although this court found the property value. Where a mortgage property is not an object for redemption, the court should order an immediate law date.
Broad's interpretation of Paragraph 40 of the mortgage is contrary to its plain meaning. Paragraph 40 of the mortgage, Exhibit #3 p. 9, is plainly and unambiguously contrary to Broad's claim that this provision evidences the parties' intent that Teachers would never recover more than the proceeds of the foreclosure sale if Broad failed to repay the loan. Paragraph 40 is a "nonrecourse" provision, the sole intent of which is to, protect Broad's general partners from personal deficiency judgments. Broad has attempted to distort the plain meaning of this provision by reading an isolated portion of Paragraph 40 and ignoring contrary language in the very same provision. Paragraph 40 expressly provides . . . "nothing in this paragraph contained shall in any way affect or impair the lien of this mortgage deed, the ability of the mortgagee to foreclose or to exercise any remedy other than one seeking such a deficiency."
The Relief the Board is seeking is precisely what the plain language of Paragraph 40 expressly prohibits; in that, the court is being asked to impair Teacher's lien by reducing the amount of the lien from $40,000,000.00 to the value claimed by Broad of the property which is $11,000,000.00 to $12,000,000.00 and to prohibit Teachers from exercising its remedy of strict foreclosure.
The court does not have to construe Paragraph 40. The plain language establishes the sole purpose of Paragraph 40 is to prevent Teachers from pursuing a personal deficiency against Broad's general partners. Broad's suggestion of a different interpretation of the words of Paragraph 40 do not make Paragraph 40 ambiguous. The court also finds that Broad's interpretation of Paragraph 40 is contrary to other provisions of the mortgage. This court does not read that Teacher's only remedy is foreclosure by sale. This court rejects Broad's interpretation of Paragraph 40 and fixes the redemption price at the full value of Broad's indebtedness.
The defendant has raised the defense of commercial impracticability. That doctrine is set forth in Dills v. Town ofCT Page 14026Enfield, 210 Conn. 705, 717-719 (1989). According to Dills . . . [a] party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has to assumed a greater obligation than the law imposes. Id.
This court finds that the nonoccurrence of an event is not a basic assumption of a contract to the extent that one party has assumed the risk of its occurrence. Whether the nonoccurrence of a contingency was a basic assumption depends primarily upon whether the parties anticipated the risk of the contingency occurring, and if so, how the parties intended to allocate the risk between them. This is a question of the parties' intent because the doctrine applies only where both parties have made the contract upon the same alleged basic assumption. To establish that a particular risk was unanticipated, and unallocated in the contract, the party invoking the doctrine must first prove that there is a gap in the contract, i.e., that the contract is silent with respect to the particular contingency which allegedly excuses performance. The theory, underlying the approach taken by the UCC and followed by the Restatement, is that the obligor is relieved of his duty because the contract, having been made on a different basic assumption, is regarded as not covering the case that has arisen. But the doctrine has no place where the contract explicitly assigns a particular risk to one party of the other.
The court said in Scinto, absent an express agreement, "the continuation of existing market conditions and of the buyer's financial situation . . . are normally not basic assumptions and do not cause discharge of contractual responsibilities under this rule." See, Scinto v. Marketcorp Properties, Inc., Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. 268994 (April 3, 1991, Flynn, J.). The obligor is generally presumed to have assumed such risks. Under the Uniform Commercial Code, therefore, even a "collapse in the market" is insufficient to invoke the commercial impracticability doctrine, "for that is exactly the type of business risk which business contracts are intended to cover." Conn. Gen. Statutes § 42a-2-615, Comment 4. In the Dills case, the Supreme Court held that where the party invoking the doctrine had anticipated and bargained for limited protection against the contingency which he claimed excused CT Page 14027 performance, he had assumed those risks outside the limits of the express contractual protection. See, Dill, 719-721.
The continuation of market conditions and Broad's financial condition was not a basic assumption of the Note and Mortgage because Teachers did not agree to assume the risk of such changes. The nonrecourse provision indicates that Broad specifically anticipated a downturn in the market that caused the property to lose value and become insufficient to satisfy the debt. Such a lose of value is the only circumstance in which a deficiency judgment is possible and, thus, precisely the circumstance Broad necessarily contemplated when it bargained for protection from a deficiency judgment. Thus, there is not a "gap" in the parties contract.
The defendants have as their fourth special defense "cashflow mortgages". A lender has no legal duty to negotiate a restructuring. The fourth special defense is legally insufficient since a lender has no legal duty whatsoever to forego the remedies it bargained for and negotiate a restructuring of a debt after default. The Superior Court has rejected defenses like the fourth special defense premised upon such a duty. See, ProvidentFinancial Service. Inc. v. Berkman, Superior Court, Judicial District of Stamford/Norwalk, Docket No. CV93-0135310S (D'Andrea, J., 1995) where a foreclosing lender's alleged failure to negotiate a restructuring of the loan was not a breach of the covenant of good faith and fair dealing absent proof of the parties' contractual expectation that they would negotiate before the lender foreclosed. See also, Dime Savings Bank of New York v.Lorent, Superior Court, Judicial District of Stamford/Norwalk, Docket No. CV90-0109719S (November 1993, Lewis, J.) which held that a foreclosing lender's withdrawal of a proposal to sell mortgaged property to borrower for outstanding principal amount alone, based upon lender's policy against selling foreclosed properties for less than full amount of the debt, did not violate the covenant of good faith and fair dealing.
A cashflow mortgage would not have been commercially reasonable under the facts of this case. The evidence is that under a cashflow mortgage, it is virtually impossible for a lender to collect any payments. Testimony was that, as a practical matter, a cashflow mortgage is impossible for foreclosure and leaves a lender with no remedy in the event of a borrower's default. CT Page 14028
The seventh special defense concerns the appointment of a receiver of rent. The court's appointment of a receiver of rent is not sufficient to warrant a set-off of the mortgage debt. The court finds that the allegation of the seventh special defense in that the claim is that the actions of the plaintiff in seeking the appointment of a receiver of rents, after it purportedly exercised its rights under the loan document, is evidence that the plaintiff has not acted in a commercially reasonable manner with regard to the premises. The court finds that that allegation has not been proven. In this case a judge specifically found that a receiver was necessary to protect Teachers and the Property, see the Memorandum of Decision on the Motion For Appointment of Receiver of Rents, September 13, 1993.
The court finds that the plaintiff has proven the allegations of the complaint. The court further finds that the special defenses claimed which were the second, fourth and seventh special defenses were not proven by a fair preponderance of the evidence. Judgment may enter for the plaintiff on the complaint and against the defendants on their special defenses.
The court enters a judgment of strict foreclosure in the form set forth prescribed by the plaintiff in Exhibit B attached to the plaintiff's post-trial memorandum dated August 29 which judgment is filed under separate cover.
KARAZIN, J.